Scott PELTZ, as Liquidating Trustee of the USN Liquidating Trust, Successor to USN Communications, Inc., a Delaware corporation, Plaintiff,

v.

Mark HATTEN, Triumph–Connecticut Limited Partnership, a Connecticut Limited Partnership, Solomon Schechter Day School of Greater Hartford, Inc., a not-for-profit educational institution, FSC Corporation, a Massachusetts corporation, and Hatten Communications Holding Company, Inc., a Connecticut corporation, Defendants.

No. 00–CV–996(RRM).

United States District Court,
D. Delaware.

June 5, 2002.

Mark Minuti, Tara L. Lattomus, Saul Ewing LLP, Wilmington, DE, Gary W. Garner, Peter J. Meyer, Ryan B. Whitacre, Gardner, Carton & Douglas, Chicago, IL, for plaintiff.

Joanne P. Pinckney, Bouchard, Margules & Friedlander, Wilmington, DE, J. Alan Galbraith, Williams & Connolly LLP, Washington, D.C., for defendants.

**MEMORANDUM OPINION**

McKELVIE, District Judge.

This is a civil proceeding arising under Title 11 of the United States Bankruptcy Code, in which the plaintiff seeks to avoid, as constructively fraudulent, certain cash transfers made in connection with a 1998 stock purchase transaction.

Plaintiff Scott Peltz is the Liquidating Trustee of the USN Liquidating Trust, successor to the bankrupt estate of USN Communications, Inc. ("USN"). USN is a Delaware corporation that sought to take advantage of the Telecommunications Act of 1996 by becoming a reseller of local, long distance, and other telecommunications services.

Defendants Mark Hatten, Triumph Connecticut Limited Partnership, Solomon Schechter Day School, and FSC Corporation (collectively, "the Hatten Sellers") were owners of all of the shares of defendant Hatten Communications Holding Company, Inc. ("HCHC"). At the time, HCHC owned Connecticut Telephone and Connecticut Mobilecom (collectively, "CT Tel"), which was in the business of reselling cellular phone and paging services. Pursuant to a Stock Purchase Agreement between USN and the Hatten Sellers, on February 20, 1998, USN purchased CT Tel, paying approximately $68 million to the Hatten Sellers for their stock in HCHC.

On February 18, 1999, less than one year after it purchased CT Tel, USN filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The USN Liquidating Trust arose pursuant to USN's First Amended Plan of Reorganization, as confirmed by the March 15, 2000 order entered by Judge Peter J. Walsh of the United States Bankruptcy Court for the District of Delaware.

On September 20, 2000, Peltz, as Liquidating Trustee of the USN Liquidating Trust, initiated this action against the Hatten Sellers and HCHC in the United States Bankruptcy Court for the District of Delaware seeking to recover monies paid to the Hatten Sellers on the ground that USN engaged in a voidable "fraudulent transfer," pursuant to 11 U.S.C. § 548(a)(1)(B), when it paid them $68 million to purchase CT Tel. Defendants answered Peltz's complaint on October 25, 2000.

On that same day the Hatten Sellers moved to withdraw the reference to the Bankruptcy Court, pursuant to 28 U.S.C. § 157(d). That motion was granted and the case was assigned to this judge.

On May 7, 2001, the Hatten Sellers amended their answer to the complaint. Therein, the Hatten Sellers deny the Trustee's claims for relief and assert several affirmative defenses. As their second affirmative defense, the Hatten Sellers contend that Peltz lacks the power to set aside the transfers under section 548, because they were payments that are part of a securities settlement payment, and may not be avoided pursuant to 11 U.S.C. § 546(e). As their third affirmative defense, the Hatten Sellers contend that because they had a good faith belief that the price of $68 million was the appropriate price for their business under the market conditions of February 1998 and did not seek to take advantage of USN, Peltz is precluded from seeking to recover the purchase price under 11 U.S.C. § 548(c).

Before trial, the defendants moved for summary judgment on these two affirmative defenses. The court considered the defendants' motion and took it under advisement.

The parties agreed to try their case to the court as a bench trial and filed their Pretrial Stipulation and Order on January 22, 2002, with trial scheduled to commence on February 4, 2002. The court held the bench trial on February 4, 5, 7, 15, 25, and 26, and April 15, 2002. During the trial, the court heard the testimony of Colin Blaydon, Peter Martin Bender–Samuels, Keith Mallinson, Herbert E. Walter II, Mark Hatten, Sharon B. Armbrust, and Robert E. Ott. The court also reviewed the designated testimony of Craig Boskey, George Doyle, Joseph Mazzarella, Jerry Cohen, J. Thomas Elliot, Ronald Gavillet, Colin McWay, Peltz, and Hatten. The court heard closing arguments on May 8, 2002. After the bench trial, the parties each submitted to the court proposed findings of fact and conclusions of law.

To determine whether USN's acquisition of CT Tel constituted a constructively fraudulent avoidable transfer under 11 U.S.C. § 548(a)(1)(B), this court must determine (i) whether USN received less than "reasonably equivalent value" in return for its payment of $68 million for CT Tel, *see* 11 U.S.C. § 548(a)(1)(B)(i), and (ii) whether USN was insolvent at the time of (or rendered insolvent by) the Closing, or USN was left with unreasonably small capital, or unable to pay its debts as they matured. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I–III).

The court has heard and considered the evidence and the arguments of the parties and has reviewed the proposed findings of fact and conclusions of law. This is the court's decision in the case.

## I. THE FACTUAL BACKGROUND

The court draws the following facts from the testimony and exhibits moved into evidence during the bench trial. The factual recitation below will constitute the court's findings of fact.

The court will begin by reviewing the background of both CT Tel and USN.

Next, it will describe the events surrounding the stock purchase transaction. Last, the court will summarize the testimony of each parties' experts on the issue of the reasonable value of CT Tel at the time of the transaction.

### A. CT Tel's Business

#### 1. Background

CT Tel was founded in 1984, and began to operate as a reseller of cellular services in February 1986. Its founder and principal owner was Mark Hatten. To build its customer base, CT targeted small and medium sized business and their employees.

As a reseller of cellular service, CT Tel entered into resale contracts with two facilities-based cellular providers, Southern New England Telephone Company ("SNET") and Bell Atlantic NYNEX Mobile ("BAM") (subsequently "NYNEX" and currently known as "Verizon").

#### 2. CT Tel's Cellular Business

In the 1996–1997 time frame, CT Tel's cellular service coverage spanned an area that encompassed the State of Connecticut and Springfield, Massachusetts.[1] CT Tel competed with the facilities-based cellular providers on the basis of service; it matched the cellular rate plans of those providers, and did not compete on the basis of price. CT Tel was technology neutral and carrier-neutral; it sought to provide its customers with services (e.g., a rate plan) and products (e.g., cell phones and pagers) that best fit the customer's specific needs without preference as to the facilities-based carrier or the hardware supplier. According to Hatten, both SNET and BAM viewed CT Tel as "good competition."

As of late 1997, approximately 70 to 75 percent of CT Tel's cellular resale volume occurred under its SNET resale contract, while the remainder occurred under its BAM contract. CT Tel's December 15, 1997 billing from SNET reflects a gross margin for CT Tel customers on the SNET system of over 47 percent. Its December 2, 1997 billing from BAM reflects a gross margin for CT Tel customer's on the BAM system of over 39 percent. As SNET accounted for 77 percent of active customers in that month while BAM accounted for 23 percent, CT Tel's gross profit margin on the combined cellular service systems was over 45 percent. This gross profit margin was in line with CT Tel's 44 percent average gross profit on cellular service for the year of 1997.

#### 3. CT Tel's Paging Business

While CT Tel started as a reseller of cellular service, in the early 1990's it entered the paging business as well. To enable it to offer paging services to its customers CT Tel entered into contracts with several paging providers, including Airtouch, Inc., Mobile Media, Inc., Paging Network, Inc., and Ram Mobile Paging (a division of BellSouth Corp.). By 1995, CT Tel marketed paging services as part of a bundled product offering with cellular services.

The paging business became a highly profitable part of CT Tel's business. In the last six months of 1997, CT Tel's gross profit margin on its paging business averaged over 52 percent.

#### 4. CT Tel's Bundling Strategy

CT Tel's Fall 1997 Business Plan notes that by 1995 CT Tel "recognized that

---

**1.** Springfield, Massachusetts was considered part of the Connecticut marketplace, as SNET was the provider in the Springfield area.

changing dynamics in the telecommunications marketplace was driving service sectors towards convergence (i.e., bundling)." Hatten confirmed that, in late 1995 and early 1996, the telecommunications industry was focusing on "bundled" product offerings, under which one company could offer "one-stop-shopping" to its customers for an array of services. By early 1997, CT Tel began to focus on "what [the] organization would have to look like" to offer a bundled product. CT perceived that bundling of various types of telecommunications services would increase its revenues, would be conducive to its target customer segment, and would reduce customer turnover (referred to as "churn").

In 1996, CT sought to obtain the requisite certifications necessary to allow it to add competitive local exchange ("CLEC") service and interstate long distance service to its product offerings. Hatten testified that by August of 1996, CT Tel "obtained all necessary regulatory approvals to offer instate long distance and local exchange [CLEC] service within Connecticut, and interstate and international long distance service." CT Tel also sought to develop provisioning and billing systems that would enable it to provision multiple services with a single point-of-entry of customer data into its systems and also to send its customer a single bill containing the monthly charges for all of the services selected by the customer. At that time, CT Tel was the only company to undertake to bundle five services on one bill.

In the Fall of 1996, CT Tel entered into a short-term contract with a long-distance provider, Citizens Communications, Inc. On April 30, 1997, it signed a two-year contract with Citizens. CT Tel started selling long-distance service in 1996. CT Tel, however, did not begin to advertise its long-distance service offering until it could also offer local service. CT began to sell

CLEC service aggressively in late 1997. In early 1998, CT Tel embarked on a major advertising campaign in which it launched its offering of a combination of long-distance service with local service and other product offerings.

In late 1997, CT Tel completed the final provider piece of its new five-in-one bundled service offering when it signed a contract with an internet service provider, Ziplink, Inc, for internet service. CT Tel's Fall 1997 Business Plan stated that "[t]he addition of Internet service is viewed by the Company as an important compliment to its local services offering, and caters to the more sophisticated and intense telecommunications user, which is the Company's target market." CT Tel first sold internet service in December 1997 or January 1998. It planned its internet kick-off for January 1998, but, according to Hatten, may have had a few customers in December 1997.

5.  *CT Tel's Asset Acquisitions (1991–93 and 1997)*

In addition to growing organically by increasing cellular subscribers, CT Tel also acquired new cellular customers by purchasing the customer lists (or cellular assets) of smaller and/or distressed cellular companies with subscriber bases in its Connecticut market. CT Tel integrated these bases into its existing customer base and made incremental gross profits from those subscribers at the same rate that CT Tel was earning at the time of its purchase, on the facilities based system (either SNET or BAM) that serviced the new customers.

In 1991–1993, CT Tel acquired subscriber bases once from GTE Corporation and twice from Nationwide Cellular Service, Inc., at the approximate price of $650 per subscriber. The second acquisition from Nationwide occurred, because Nationwide

wanted to shed the Connecticut subscriber base of a New Jersey company that it had just acquired. Hatten reported that Nationwide sold its Connecticut subscriber bases to CT Tel because it had not been successful in competing with CT Tel for Connecticut customers.

In early 1997, CT Tel acquired two more cellular bases that became available for purchase at that time. In March 1997, CT Tel acquired the cellular base (945 subscribers) of Message Center, Inc. at a price of $350 per line. In April 1997, CT Tel acquired the cellular base (7,383 subscriber) of Smart World, Inc., a company in serious financial difficulty, at an initial price of $485 per line and a net price after customer turnover or "churn" of $435. CT Tel management viewed both transactions as extremely favorable deals for CT Tel. The additional base minutes associated with these subscriber base acquisitions put CT Tel into a new pricing tier with SNET, which in turn led to extremely strong margins on the resale of SNET service.

### 6. CT Tel's Retail Stores and Out-of-Market Expansion Opportunities

CT Tel operated on a retail store business model, relying on retail stores as an important channel of distribution. As of April 1997, CT Tel was operating a total of nine retail stores in Connecticut (including its store in Springfield, Massachusetts). Around that time, CT began taking steps to expand out-of-market into adjacent states—Rhode Island and Massachusetts. For that purpose, in April 1997, CT Tel organized corporations under the names U.S. East Telecommunications of Rhode Island, Inc. and U.S. East Telecommunications of Massachusetts, Inc. By late Fall of 1997, CT Tel had moved out-of-market into Rhode Island and Massachusetts, with three new stores—two in Providence, Rhode Island and one in nearby Seekonk,

Massachusetts—ready to open in early 1998. During that same time period, CT Tel identified six additional locations and several actual retail store sites for further store expansion in Connecticut, Rhode Island, and Massachusetts. In total, CT Tel was planning to open up to twenty or more additional stores in the near future in Southern New England. CT Tel's out-of-market target customer continued to be the small and mid size business segment.

By late 1997, CT Tel was also positioned to grow rapidly out-of-state through acquisitions. Two such acquisitions were being contemplated at that time: Business Long Distance (BLD) and CellNet Communications, Inc.

In September 1997, CT Tel had been introduced to BLD, a small but well-managed CLEC in the Boston area, which was having difficulty obtaining access to capital. BLD was a reseller in the northeast that had electronic provisioning with NYNEX. Discussions with BLD led to a signed letter of intent and, in November, preparation of an integration plan, in which CT Tel described its anticipated out-of-market growth in connection with BLD. CT Tel commenced discussion with one of its lenders, Bank of Boston, for a separate acquisition facility to fund the purchase of BLD.

CT Tel was also moving in the direction of expanding its geographic scope out of the northeast and into Michigan. CT Tel was exploring an opportunity to acquire CellNet Communications, Inc., a substantial but troubled reseller of cellular services in Detroit, Michigan.

### 7. Digital PCS Entry

By late 1997, it had been known for some time that digital PCS cellular phone service would come to Connecticut. PCS, which stands for "personal communications services," was a digital cellular phone ser-

vice that operated at a different frequency band than traditional cell phones. PCS systems could provide new digital services to customers and were designed to allow increased user mobility. CT Tel viewed the advent of digital PCS service as a great future growth opportunity for CT Tel because it meant that new customers would be looking at the product.

CT Tel entered into negotiations with Sprint PCS to become the first reseller of Sprint PCS. Shortly after February 20, 1998, CT Tel entered into the nation's first resale contract with Spring PCS. By late 1997, CT Tel had negotiated a contract with a second PCS provider, NextWave Telecom, Inc. CT Tel was also in discussions with OmniPoint Corporation, another PCS provider. CT Tel was therefore in a position to offer customers a choice of digital PCS cellular phone service.

### 8. The January 1998 Five–in–One Launch

In January 1998 CT Tel launched its five-in-one campaign, a major television and billboard promotion in which CT Tel offered cellular, paging, local, long distance, and internet service—an "all-inclusive-package" of telecommunications services—for $49.95 per month. CT Tel viewed its bundled service as an important market differentiator, as it underscored CT Tel's evolution from a cellular reseller into a full service telecommunications company. CT Tel was the first telecommunications company in the United States to bundle cellular, paging, local, long distance, and internet onto a single bill.

### 9. CT Tel's 1998 Market Position and Industry Outlook

As of January 31, 1998, CT Tel had 65,243 active cellular lines, 15,836 active paging lines, 3,226 active long distance lines, 1,436 active local service lines, and 76 active internet lines. Documents from that time period, dated February 16, 1998, indicate that CT Tel had 176 employees.

By early 1998 CT Tel was the fourth largest cellular reseller in the United States. The telecommunications industry was consolidating, and larger companies like CT Tel were buying the cellular assets of smaller companies and integrating them into their subscriber base, as CT Tel has done earlier in 1997 and 1991–1993. Thus, the largest resellers, like CT Tel, accounted for the vast majority of reseller subscribers.

CT Tel had achieved at least a 10 percent market share in Connecticut, in a market with only 20 percent penetration. That CT Tel's relevant market had only 20 percent penetration indicates that there was the potential for large growth.

Several industry research reports indicate that the outlook for future growth for wireless resale in early 1998 was optimistic. For example, a February 1998 Yankee Group Report on the future of wireless resale projected that "[r]esale will sustain a relatively high customer growth rate in comparison to the industry, as resale net adds start to make up a larger portion of total industry net adds." The report further explained that "resale has proven to be a practical option for both the carriers, with idle network capacity and limited penetration into certain market segments, and the customers, who may be price conscious and require specialty services to make wireless a more valuable service to them." A number of other industry reports confirm that this rosy view was widely held.

### 10. CT Tel's Business Fundamentals

Based on a number of indicators, CT Tel had sound business fundamentals in place for future growth. In short, "CT Tel was

a company that was doing well among resellers in the reseller environment."

First, CT Tel had a high gross profit margin—approximately 45 percent—relative to the cellular resale industry averages of 33 to 35 percent. Second, CT Tel had an average monthly cellular bill of $51.20, which was higher than the industry average of $42.78 and about five dollars higher than the average bill of BAM, one of its two major providers. Third, CT Tel's 1997 churn rate of 2.17 percent was below the cellular resale industry average of about 2.5 percent. In 1996, CT Tel's churn rate was even lower, at 1.97 percent. The increase in churn rate in 1997 was due, at least in part, to customer deactivations from CT Tel's base of certain recently purchased customers. Fourth, CT Tel's gross per customer acquisition cost, a measure of marketing efficiency in the industry, was low relative to the reseller industry. CT Tel's business records show that in the period from August 1997 to December 1997, the average effective cost of adding one new cellular subscriber was $788.23. Fifth, CT Tel's cellular growth rate in 1996 and 1997, 42 percent and 16 percent respectively, was ahead of resale industry averages of 33 percent and 12 percent, and was in line with the growth rates of SNET and BAM in the Connecticut area. Sixth, unlike almost all other resellers, CT Tel was EBITDA positive.[2]

### B. *USN's Business*

USN initially entered the local telecommunications market as a competitive local exchange carrier ("CLEC") with network

facilities in Ohio. In early 1996, USN sold its existing facilities in Ohio to pursue a non-facilities-based (i.e., reseller) approach in the local telecommunications market in anticipation of the impact of the Telecommunications Act of 1996. The Telecommunications Act of 1996 enabled CLECs, like USN and CT Tel, to compete with incumbent carriers by opting to buy into existing telephone line infrastructures from those carriers, rather than to build new lines themselves.[3]

Like CT Tel, USN targeted the burgeoning high profit niche market of small and medium-sized businesses. As USN's former President and Chief Executive Officer, J. Thomas Elliot, stated, USN's "business vision was to grow a big company, to use to existing facilities that were there provided by RBOCs [Regional Bell Operating Companies], bundle those services together for small and medium size businesses, and create a very large company and be first out of the gate in this wide open local bundle services marketplace."

USN negotiated the first total service resale agreement with Ameritech Corporation for local services in late 1995. Ameritech served the Chicago area and the upper Midwest. In July 1996, USN also signed a comprehensive local resale agreement with NYNEX. During 1996, USN entered into various other agreements with carriers for the resale of long distance and enhanced and other value-added services.

USN began marketing and provisioning services under its resale agreements dur-

**2.** "EBITDA" is earnings before interest, taxes, depreciation, and amortization.

**3.** As part of the deregulation of the telecommunications industry, the Telecommunications Act of 1996, Pub. LA. No. 104–104, 110 Stat. 56 (1996), required incumbent local exchange carriers ("ILECs"), such as Ameritech

Corporation and Bell Atlantic Corporation, to offer and price network components individually so that CLECs could access essential components of local networks. The purpose of these requirements was to effect deregulation in a manner that opened the telecommunications markets to increased competition.

ing the latter half of 1996, generally referring to the Ameritech region as the Midwest Region and to the NYNEX region as the Northeast Region. By late 1997, USN was selling services to customers in certain states in the Northeast Region (Massachusetts, New York, and Rhode Island) and in the entire Midwest Region (Illinois, Indiana, Michigan, Ohio, and Wisconsin). At that time, USN had 34 offices in nine states, including four in Massachusetts and one in Rhode Island.

USN's February 3, 1998 IPO Prospectus indicates that USN was "one of the fastest growing" CLECs in the United States. USN's growth escalated sharply in 1997, particularly in the fourth quarter. According to an article in Newsfirst Extra, dated September 22, 1997, USN vaulted from a ranking of 1,332 in number of access lines all the way to number 20 in that year. USN's Prospectus indicates that during 1997, USN increased its aggregate local access lines in service from 8,364 to 171,962 lines. As of December 31, 1997, USN "had sold 191,069 local access lines, including 55,897 lines which were sold in the fourth quarter."

The USN product offerings consisted of local and long distance service; it had no wireless product. Cell phone service was the single most requested service of USN by its customers and "[its] customers wanted it right then."

USN believed that the addition of a cellular product offering for its customers, "was, from a time and market perspective, critical." To remain competitive in the industry, USN sought to respond to this customer request to add cellular service to its existing offerings. USN formed an internal product group to evaluate the addition of cellular to its product offerings. Faced with the decision whether to buy or build a wireless service capability, USN made the decision "to find a partner that

had management capability that [it] could quickly absorb and grow on the wireless side." USN decided to buy cellular capability rather than build it, because the wireless industry was very different from the wireline industry in which USN had experience. Thus, by summer of 1997, USN "was considering quite actively a cellular acquisition." In December 1997, its internal evaluation group recommended that USN "move forward in the New York market first."

## C. Overview of USN's Acquisition of CT Tel

### 1. USN's Planned Fall 1997 IPO

After USN raised capital through a high yield bond offering in September 1997, USN discussed with its underwriters the possibility of "going public." Elliot testified that during that time period, a number of telecommunications companies had gone public and the markets "were pretty receptive" to them. USN planed to go public at the end of 1997 with an initial public offering (IPO) in the amount of $75 million, and filed a registration statement with the SEC to that effect. USN prepared to go forward with the IPO that it planned to launch prior to Christmas, in anticipation of a European and United States "road show" prior to the holidays.

In October 1997 the public markets dropped precipitously. According to Elliot, the "markets all got very squeamish, and it was so close to the Christmas holiday period," that USN decided not to go forward with the IPO at that time.

### 2. The USN–CT Tel Negotiations

Prior to October 1997, USN hired Joseph Scally to seek out potential acquisitions. USN's Board of Directors expressed interest in finding potential acquisitions. A committee of the USN

Board chose to hire Scally to perform this function rather than an investment banking group. Scally developed a list of a number of different companies for USN's consideration, including CT Tel. He first brought CT Tel to USN's attention as a potential acquisition candidate in mid-October 1997. There was no prior relationship of any sort between USN or CT Tel or their respective executives.

CT was not being marketed for sale in the Fall of 1997. However, as Hatten testified, "everything is for sale" if the price and other key criteria are right. When Scally called Hatten to discuss whether he would be willing to sell CT Tel, Hatten told Scally that he was not interested in selling to anyone who would buy CT Tel for its assets, because he did not want CT Tel employees to lose their jobs. Hatten also told him that the would only contemplate a cash deal, as opposed to one for stock.

On October 15, 1997, Scally sent Elliot a memorandum offering to set up a meeting with CT Tel. He noted in the memorandum that CT Tel had "Two shareholders (Mark Hatten and Triumph Capital) looking for liquidity." After Scally brought CT Tel to Elliot's attention, Elliot and Ronald Gavillet, USN's Executive Vice President for Strategy and External Affairs, met with two of CT Tel's senior operating executives, Chief Operating Officer Colin McWay and Executive Vice President Joseph Mazzarella, at a Telecommunications Resellers Association convention. Thereafter, Elliot called Hatten, inquiring if he would consider the sale of his company. Hatten testified that he raised with Elliot the issue of CT Tel's employees and told Elliot that he would only accept cash and that his price was $70 million.

The facts demonstrate that USN's acquisition of CT Tel was negotiated and closed at arm's length between a willing buyer and a willing seller with reasonable knowledge of all relevant facts. The parties started no more than $5 million apart on the transaction price and reached agreement on a price between their starting points in a brief negotiation. Hatten recalled receiving the next call from Elliot within a week or two and negotiating the acquisition price on his cell phone. According to Hatten, Elliot offered $65 million, and they thereafter agreed on a price of $68 million. Elliot confirmed that he personally negotiated the price with Hatten, stating that "we felt the initial price was too high. We came in with a different price. There was a negotiation around that pricing structure, and we ended up where we ended up [at $68 million]." USN and CT Tel reached this understanding as to price on or about November 19, 1997. As part of the contemplated deal, USN intended to retain McWay and Mazzarella to manage CT Tel after the acquisition.

Both the Hatten Sellers and USN believed the price to be "very fair." Based on recent comparable acquisitions of cellular resellers—such as WorldCom Inc.'s 1997 acquisition of Comtech Wireless, Inc. and WorldCom's 1996 acquisition of Choice Cellular, Inc.[4]—the Hatten Sellers believed that the enterprise value of CT Tel was worth a little more than $1000 per cellular subscriber. They reasoned that WorldCom had acquired Choice and Comtech for $900 or more per line, and that CT Tel had added value due to its management talent, its successful 12 year operating history, its additional services (paging, local, long distance, and internet), and its integrated platform.

4. These transactions are discussed in further detail infra, in section I.C.3.c.i.

USN, for its part, recognized that prior sales of cellular reseller companies had been in the $900 to $1000 range, but also recognized that CT Tel had "some other things that were different from the typical cellular reseller"—especially CT Tel's unique bundled service product that combined cellular, paging, local, long distance, and internet services on a single bill, along with the regulatory work associated with putting that combined service into place. Industry analysts perceived this ability to bundle services as quite valuable. One 1996 report, by Group IV, noted that "[c]ompanies that offer one-stop shopping solutions will draw heftier sale prices than those who offer fewer services to their customers."

USN also perceived that CT Tel was very valuable to USN from both a geographic and product point of view. On a geographic basis, USN's footprint extended to New York, Massachusetts, and Rhode Island, but USN's east coast service providers, NYNEX, did not service Connecticut. Moreover, USN recognized that extending its coverage to Connecticut would not be easily accomplished. SNET was not a Regional Bell Operating Company and was therefore not required by the FCC to offer local resale. The fact that CT Tel had gone through the process to become a CLEC in Connecticut, along with its long distance offering, was "extremely attractive" to USN. On a product basis, USN recognized that cellular was "the single most requested additional product line" requested by its customers and that the provision of this service was "critical" in order to remain competitive. USN also saw great value in CT Tel's "outstanding" senior operating management, McWay and Mazzarella, who were to stay on under employment agreements with USN.

### 3. USN's Due Diligence

Before entering into the Stock Purchase Agreement that consummated USN's acquisition of CT Tel, USN engaged in due diligence to evaluate the transaction. In a November 26, 1997 letter to Hatten, Elliot sent the first written offer to purchase CT Tel and confirmed that USN would acquire CT Tel at an enterprise value of $68 million, with the equity value being reduced by the amount of debt that would be either assumed or refinanced by USN. The letter stated that USN "looked forward to starting our due diligence on Tuesday, December 2, and I have instructed our attorneys to begin preparing appropriate documentation." Prior to commencing with formal due diligence, Hatten and Elliot signed a Confidentiality Agreement dated December 1, 1997.

Elliot discussed issues surrounding the acquisition of CT Tel with USN's Board of Directors on December 4, 1997. Those issues included "provisioning, billing, margins, the existence of comparable transactions for benchmarking the price of the acquisition and expectations for the integration of Connecticut Telephone into the operations of the Corporation." The Board decided to finance the acquisition, if consummated, with proceeds from its pending IPO. Thus, the acquisition was "conditioned on the successful completion of an initial public offering with appropriate parameters for valuation and proceeds." Elliot reported to the Board that, as a result of market conditions in November, its underwriter Merrill Lynch had advised USN to delay the IPO until January of 1998.

In addition, by resolution during that meeting, USN's Board formed an Ad Hoc Committee to "oversee or review the completion of due diligence and the preparation of a financial model relating to the proposed acquisition" and to "make a rec-

ommendation regarding the advisability of proceeding with the proposed acquisition." USN also engaged Deloitte & Touche LLP ("D & T") to assist it in performing due diligence on CT Tel.

### a. *The Ad Hoc Committee*

The Ad Hoc Committee was comprised of three of the Board members, Directors James Hynes, David Mitchell, and Richard Brekka. Hynes and Mitchell had just joined the USN Board in December of 1997. Hynes was the Managing Director of Fidelity Capital Corporation, the investment arm of the Fidelity Funds, having managed its telecommunications group since 1990. Fidelity Capital invested $15 million in USN in late 1997. Mitchell had been a senior executive with Rochester Telephone/Frontier, and was an adviser or board member of several telecommunications companies. Brekka was a USN board member since 1994. He had headed a telecommunications fund and served on the boards of several telecommunications companies.

On December 9, 1997, the Elliot and the Ad Hoc Committee met by telephone conference call. The meeting minutes indicate that prior to meeting, the members of the Committee had been provided with various materials relating to the acquisition. These materials included: "[a] memorandum summarizing operations, territory, vendors, ownership and historical financial information of [CT Tel] as well as proposed terms of the acquisition and the anticipated business strategy of the combined companies;" financial projections for both USN and CT Tel on a stand alone basis; pro forma financial projections giving effect to the acquisition; historical financial statements of CT Tel; various media articles about CT Tel; and various sales materials used by CT Tel. The Committee then asked numerous questions regarding CT Tel's historical financial statements and the anticipated impact of CT Tel's projected financial data on a discounted cash flow analysis of USN. The minutes further report that "[i]n particular, the Committee inquired as to the various assumptions underlying the analysis, including the expected penetration of wireless products into the Corporation's customer base, discount rates, assumed terminal values, and other matters." Last, Elliot updated the Committee on the ongoing due diligence investigation and negotiations with CT Tel.

On December 17, 1997, the Ad Hoc Committee met by conference call to discuss the CT Tel acquisition. Elliot again updated the Committee on due diligence efforts regarding CT Tel, reported on feedback he had received from analysts at USN's underwriter, Merrill Lynch, and summarized key issues in the ongoing negotiation. Elliot reported that although "[n]either Dan Reingold nor Mark Kastan, analysts for Merrill Lynch in the telecommunications sector, had yet done a valuation analysis of the Corporation on a pro forma basis giving effect to the acquisition of [CT Tel] ... [,] the Merrill Lynch investment banking team was confident that the incremental effect of the acquisition of [CT Tel] on the valuation of the Corporation would exceed the purchase price contemplated for the acquisition." With respect the acquisition negotiation, Elliot reported that the Hatten Sellers had a concern about a financing condition in the USN acquisition proposal that tied the acquisition into the USN IPO, and discussed the desire of the Hatten Sellers for a $2.5 million earnest money deposit in the event that they received a higher unsolicited offer for CT Tel.

On December 23, 1997, the Ad Hoc Committee met to discuss the acquisition of CT Tel, including the underwriter's as-

sessment of the value of the acquisition to USN. The minutes report the participation of Chris Swenson of Fidelity Capital at the invitation of the Committee. The minutes state that "Mr. Elliot reported that the Corporation's underwriters had done an analysis of the effect of the [CT Tel] acquisition on the valuation of the Corporation and had concluded that the incremental value to the Corporation exceeds the purchase price of the acquisition." The minutes reflect that committee members asked numerous questions of Elliot regarding pending issues in the acquisition negotiations and factors affecting the underwriters' valuation of CT Tel. After the presentation, the Committee resolved, subject to the resolution of certain still open issues, to recommend to the Board that it proceed with the acquisition of CT Tel.

On December 31, 1997, USN's Board of Directors met by telephone conference call. At that meeting, Mitchell summarized the process undertaken by the Ad Hoc Committee in reviewing the potential acquisition. Hynes and Mitchell then advised the Board that the Ad Hoc Committee recommended that USN proceed with the acquisition of CT Tel. The Board agreed to meet again on January 5, 1998, after it had time to review certain materials relating to the acquisition, to consider the CT Tel acquisition.

On January 5, 1998, the Board met by telephone conference call and again discussed the acquisition. The Board authorized management to enter into an agreement to acquire CT Tel.

b. *The Deloitte & Touche Due Diligence*

As noted above, Senior USN management also engaged D & T to assist USN in performing due diligence on CT Tel. A team from D & T led by Maureen Errity, a cellular expert, examined all significant operations of CT Tel and prepared an extensive "Project Concept Due Diligence Report" on CT Tel for USN. D & T's findings and observations in its report are based on information derived from discussions with CT Tel executives and from reviewing audit working papers and financial papers for the fiscal year ended April 30, 1997 and financial, accounting, and other information supplied by CT Tel management. The Hatten Sellers cooperated fully in the D & T due diligence, providing D & T full access to CT Tel's books and records; the Liquidating Trustee makes no contention that CT Tel withheld any information from USN or its agents.

D & T went to CT Tel to conduct due diligence in the beginning of December 1997. The D & T report indicates that it includes their findings and observations resulting from procedures performed through December 19, 1997. D & T issued its report to USN on December 23, 1997.

The purpose of the D & T report was to provide information and highlight issues for USN to consider in connection with the acquisition. The report states that due to the purpose and limited scope of D & T's engagement, "the comments and observations included in the report are primarily (a) negative in content and (b) limited principally to those matters that, based on our discussions with [USN], would appear to be of significance or interest to [USN] or that might require further follow-up in connection with the consummation of the proposed investment." In addition, the report does not express "any opinion concerning the merits of the proposed transaction or the fairness of the contemplated terms thereof."

c. *Senior Management Due Diligence*

i) *Comparable Transactions*

In gathering materials for the Ad Hoc Committee, USN management developed

detailed materials about CT Tel, about the industry, and about the value of CT Tel. USN staff developed a listing · called "SAMPLE SUB PRICING," in which it listed the price per subscriber as stated in source documents available to it, including the 1996 Group IV Report. These included the acquisitions of Comtech, Inc. (at a price of $955 per subscriber), Nationwide Cellular, Inc. (at a price of $790 per subscriber), and of CellTech International, Inc. (at a price of $1000 per subscriber).

Additionally, senior USN management, namely Elliot and Gavillet, considered comparable transactions for the purpose of aiding in the valuation of CT Tel. Elliot discussed the Nationwide, Choice, and Comtech transactions with Hatten, focusing mainly on the WorldCom's acquisition of Choice, which was closing at that time. Hatten also informed Elliot that MIDCOM had offered about $1,000 per subscriber for CT Tel in 1995. Gavillet's notes reflect that he independently undertook to confirm the price per subscriber in the Comtech transaction. He learned that WorldCom purchased Comtech for about $900 per subscriber. Elliot testified that the comparable per subscriber valuations made senior management and the Board feel comfortable about the acquisition price.

Because the parties both considered "comparables" transactions (i.e., recent sales of cellular resellers) in arriving at what they believed was an appropriate valuation of CT Tel, the court will review the most pertinent of those transactions in this section. The parties to the transaction agreed that comparable sales consisted of sales of full companies, and not base (or strip) asset sales of customer lists.[5] The

parties further agreed that line count was and is a highly used indicator of valuation in the telecommunications industry.

The parties were aware of the value at which four cellular resellers were sold in the marketplace in the period from 1995 to 1997. Senior USN management discussed comparable sales with senior CT Tel management, with Elliot discussing these four transactions with Hatten. These transactions demonstrate that the payment of $900 to $1,000 per line for a high quality reseller was be in line with marketplace values in the period from 1995 to early 1998.

### 1. *The Comtech Transaction (1997)*

The parties agree that the most recent full company acquisition prior to USN's acquisition of CT Tel was the purchase of Comtech Wireless, Inc., a northern California cellular reseller, by WorldCom, Inc.

In early 1997, Prime Matrix Wireless Communications, Inc., a southern California cellular reseller with about 50,500 subscribers, offered to acquire Comtech at a price that approximated $955 per subscriber. Prime Matrix anticipated that Comtech would have approximately 54,000 subscribers by closing in April 1997. However, the high yield debt offering that Prime Matrix had hoped to use to finance the acquisition did not go forward and the sale of Comtech to Prime Matrix did not close. WorldCom then undertook to acquire Comtech in a cash transaction at the same enterprise price that Price Matrix had agreed to pay. Because Comtech was continuing to add customers, thereby reducing the price on a per customer basis, even though the enterprise value remained the same, the price per subscriber when

---

**5.** This makes sense, as typically asset-based sellers are selling because that is their best alternative (i.e., they are financially distressed). Thus, full service, well-performing telecommunications companies are not fairly valued by way of comparison to asset-based transactions.

WorldCom closed the transaction with Comtech was about $900 per subscriber.

Comtech's cellular margin was 25 percent, but as a result of a renegotiation with its provider several months prior to the Prime Matrix offer, its going forward margin was 38 percent. Comtech had no paging operations and did not offer local, long distance, or internet services. Comtech's distribution was through agents, not stores, which made its method of distribution vulnerable to PCS companies entering the market. While Comtech was a full company acquisition, WorldCom's primary interest was in its cellular base and its sales and marketing operations.

### 2. *The Choice Transaction (1996)*

In 1996, WorldCom acquired Choice Cellular, Inc., an Arizona/Utah reseller with about 35,000 subscribers. WorldCom agreed to pay about $1,000 per subscriber. However WorldCom did not close on the Choice transaction for several months. Due to subscriber growth, the price per subscriber at closing was roughly $900 per subscriber, including Choice debt assumed by WorldCom. The closing price per subscriber, ignoring debt assumed by WorldCom, was $878 per subscriber.

Choice had some paging, but it was significantly less than CT Tel's paging capabilities. Choice did not have local, long distance, or internet.

### 3. *The Nationwide Transaction (1995)*

In late 1995, MCI Communications Corporation acquired Nationwide Cellular Service, Inc. to compliment its long distance service. Nationwide was a cellular reseller and was a public company at the time. At the time of contract Nationwide had 211,-000 subscribers, but by closing six months later, it had 292,000 subscribers. MCI purchased Nationwide, in a cash for stock deal, at an enterprise value of $210 million.

The parties in their respective cases-in-chief agree that the price per subscriber was close to $1,000 at the time of contract but, due to new customer growth and a delay of six months between time of contract and time of closing, the transaction closed with a per subscriber value of $719.

Nationwide's gross profit margins were approximately 35 percent. At the time of the sale, Nationwide was under significant pressure from a number of directions, including capital pressure and loss from cloning fraud. *See* U.S. Industry & Trade Outlook 1998, Telecommunications Services (discussing significance of fraud issue in 1995, before emergence of new fraud prevention technologies in 1996). It was also significantly EBITDA negative. Nationwide had some paging, but no local, long distance, or internet product offerings.

### 4. *The Celltech Transaction (1995)*

In 1995, in a transaction well known in the industry, MIDCOM, Inc. acquired Celltech International, Inc., a small reseller in the Pacific Northwest with about 4,500 subscribers for about $1000 per line. Celltech did not have a significant organization; MIDCOM purchased Celltech to take advantage of Celltech's contract with AT & T.

### ii) *Financial Modeling*

Senior USN management met with senior CT Tel management in Boston and reviewed in detail all aspects of CT Tel's business. Both parties provided to each other numerous financial documents and business records.

Under the supervision of senior management, USN staff undertook to build financial models of USN's projections for CT Tel going forward after the acquisition. As USN gathered data about CT Tel, USN

ran a number of Discounted Cash Flow (DCF) studies. A DCF model assigns a value to a corporation by projecting its future cash flows or income streams (based on the corporations present and past cash flows and its projected growth rate), determining the present value of those future income streams (by assigning an appropriate discount rate and performing a present value calculation), and then summing up those income streams.[6] This valuation work primarily was performed by Patrick Landry, director of USN's Business Development Group, with the assistance of USN Accounting and Finance Departments and also in interactions with the USN investment banking team. In late 1997, Landry visited CT Tel over a two-to-four day period to review CT Tel's operating and financial data, and met with McWay to discuss CT Tel's current plans and business direction. CT Tel provided Landry with data to build his model and Landry validated his assumptions with CT Tel management. Landry worked directly for Gavillet, who testified in an arbitration proceeding that Landry was building his projections "at the same time that Deloitte & Touche was doing on the ground due diligence." Using CT Tel's projections, Landry modeled and kept refining his model of an acquisition of CT Tel by USN on a stand-alone basis, an incremental basis, and a combined basis up until January 7, 1998, the date that USN signed the Stock Purchase Agreement to acquire CT Tel.

Landry's models performed valuations of CT Tel using DCF analyses. USN senior management, including Elliot and Gavillet reviewed Landry's modeling prior to sharing it with USN's underwriters. It is a fair inference that the Ad Hoc Committee reviewed the models as they evolved, in accordance with its charge to "oversee or review ... the preparation of a financial model relating to the proposed acquisition."

The last of Landry's studies prior to closing on February 20, 1998 was Landry's January 7, 1998 study. It showed that CT Tel had a firm value (as a stand-alone company) of $114 million, an incremental value in USN territories of $148.2 million, and a combined value of $262.3 million.[7] In the CT Tel stand-alone case, USN assumed that CT Tel would have 15 stores in operation by the end of 1998 and 21 stories in operation by the end of 2000. This growth is consistent with the new store projections of CT Tel itself in its own business plan at that time. Elliot testified that "the final model, remembering Mr. Landry was cranking out models all the time, was satisfactory to me ...."

iii) *Involvement of Underwriters*

Senior USN management also involved its underwriters, the investment banking divisions of Merrill Lynch & Co., Donaldson, Lufkin & Jenrette, and Cowen & Company, in the CT Tel acquisition process. All were and are well respected

---

**6.** As the Delaware Chancery Court has summarized explained, "[t]he DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value." *Cede & Co. v. Technicolor, Inc.*, C.A. No. 7129, 1990 WL 161084, *7 (Del. Ch. Oct. 19, 1990).

**7.** An earlier model, which Landry had sent to the underwriters on December 23, 1997, showed that CT Tel had a firm value of $75.2 million, an incremental value in USN territories of $202.4 million, and a total value of $277.6 million.

firms, which are sophisticated and experienced in the field telecommunications.

USN's strategic view of the transaction is best encapsulated in a December 20, 1997 letter from Gavillet and Landry to the underwriters, which attached a memorandum, CT Tel's historical financial results and management, and Landry's DCF valuation models. The memorandum notes that the CT Tel acquisition:

truly represents a 'missing link' solution for USN on both a geographic and product basis, by filling the Connecticut 'hole in the donut' and completing the USN product integration puzzle. In addition it thrusts USN's growth strategy into overdrive by injecting high demand, high revenue, and strong margin wireless products into the rapidly growing USN customer base .... Wireless is a 'must have' product for USN .... Growing the necessary expertise to successfully resell wireless services and products would take considerable time, money, and effort. Even after expending such time, money, and effort, in the best case, USN could only hope to achieve the increasingly profitable results demonstrated today by Connecticut Telephone.

The letter also details "several other significant synergies" that CT Tel brings to USN, and notes that the assumptions used to generate the attached financial models only included the benefit of a few of those synergies. It notes that the even based on "conservatively estimated projections of penetration of cellular/PCS into the USN base," "the valuation of this acquisition is strong."

The underwriters conducted their own due diligence and reviewed the financial information and DCF models, to determine whether the price USN was paying for CT Tel was appropriate. No underwriter reported to USN that USN was paying too

much for CT Tel. Rather, the purchase of CT Tel "fit within [the underwriters] thinking as to getting a customer base and adding services to it as being a large value creation exercise." Indeed, Elliot reported that the underwriters were very excited about the purchase of CT Tel and assured USN that the it would be able to raise the proceeds required to acquire CT Tel in its IPO and that "[p]urchasers of USN stock would, in fact, give significant value to the Connecticut Telephone acquisition, that it would become part of the IPO."

In addition, USN management obtained required consents from its bondholders at Merrill Lynch Asset Management under applicable covenants in its debt instruments to proceed with the acquisition of CT Tel. Elliot obtained the required consents from a Brian Ison, a representative of the bond holders, after Ison's representative conducted some limited due diligence by attending a meeting at CT Tel.

### 4. Closing the Transaction—USN's IPO and Purchase of CT Tel

When the USN Board authorized its management to go forward with the acquisition of CT Tel, the basis upon which USN proceeded with the acquisition was that the capital raised in the IPO would finance the acquisition. While USN had been considering an IPO in the amount of $75 million in the Fall of 1997, it moved forward with an IPO in the amount of $128 million in early January 1998. USN and the underwriters raised the dollar amount of the IPO by $53 million, an amount equal to the value of the equity component of CT Tel (i.e., the CT Tel enterprise value less the CT debt). Thus, USN and the underwriters believed that the equity component of CT Tel was worth the $53 million that would be paid at closing for the equity of the Hatten Sellers.

The parties signed the Stock Purchase Agreement at $68 million enterprise value on January 7, 1998. In the Agreement, USN's obligation to purchase was contingent upon the successful completion of the USN IPO, as the USN Board had decided. Specifically, USN was not required to consummate the CT Tel sale unless the price per share sold in the IPO was at least $16 and the IPO resulted in gross proceeds of at least $125 million. CT Tel represented and warranted that as of January 7, 1998 it had "64,800 revenue producing cellular telephone access numbers and paging services to not less than 15,100 revenue producing paging units." CT Tel also agreed not to solicit any acquisition proposal pending the closing of its transaction with USN. In addition, USN could prevent CT Tel from accepting any higher valued competing proposal by depositing $2.5 million into escrow.

On January 9, 1998, USN issued a press release stating that it was acquiring CT Tel. USN stated that "[t]he acquisition will enable USN to add cellular services to its local and long distance product bundle, as well as adding the Connecticut footprint to USN's service area." Elliot is quoted as stating that "[c]ellular services is a critical and logical extension of our product offering" and that cellular is a highly requested service for USN's target market of small to medium businesses.

One week after the Stock Purchase Agreement was signed, USN senior management and the underwriters went on the road for two weeks to market the USN IPO. Elliot testified that the acquisition of CT Tel was "a definitive part of the whole process of going public, including not just in the prospectus but in the documents that were part of the roadshow." The roadshow documents contain substantial discussion of the CT Tel acquisition, including its incremental or synergistic value to USN, including that it "catapults USN to [a] fully integrated product portfolio," "adds strong management expertise in cellular, PCS, and paging," and "adds significant adjacent state expansion." USN perceived that the acquisition of CT Tel would provide it with the strategic flexibility comparable to that of large telecommunications companies, such as MCI and WorldCom, that had begun as resellers. The roadshow documents also show that USN and the underwriters projected that USN would turn EBITDA positive in the year 2000.

USN's Prospectus for the sale of stock to the public became effective on February 3, 1998. USN's Form S–1 Registration Statement and the Prospectus state that the purchase price of CT Tel is $68 million. Each of the underwriters supported USN's acquisition of CT Tel at an enterprise value of $68 million. The Prospectus identifies CT Tel as a major and material use of the proceeds. It contains CT Tel's financial statements, recites the number of CT Tel's cellular and paging lines, and contains pro forma financial statements showing the performance of USN and CT Tel on a combined basis for the year ended December 31, 1996 and the nine months ended September 30, 1997.

USN's IPO closed on February 4, 1998 at an opening price of $16 per share for a total issuance of 8.6 million shares. The IPO was oversubscribed and Merrill Lynch exercised its over-allotment option. It sold 600,000 of the additional 1.2 million shares made available to it during the week of February 4. A number of persons intimately familiar with the details of USN's acquisition of CT Tel purchased USN stock in the IPO, including USN director Mitchell, USN Chief Operating Officer Dennis Dundon, USN Chief Financial Officer Gerald Sweas, and CT Tel's Hatten and Mazzarella.

On February 9, 1998, USN received net cash proceeds of $128 million from its offering by wire transfer from Merrill Lynch. In March 1998, USN would receive a further $400,000 from sales of additional shares to cover the underwriters' over-allotment options.

The USN–CT Tel transaction closed on February 20, 1998. As the parties stipulated, "USN used approximately $68 million of the IPO proceeds to pay the Purchase Price for CT Tel at Closing (including the retirement of CT Tel debt)." At the Closing, pursuant to the Stock Purchase Agreement, the Hatten Sellers delivered all of the issued and outstanding stock of HCHC to USN at the New York office of Skadden, Arps, Meagher & Flom, USN's counsel. At the time of the Closing, HCHC owned all of the issued and outstanding stock of CT Tel, including the stock of Connecticut Telephone and Communications, Systems Inc., Connecticut Mobilecom, Inc., U.S. East Telecommunications of Massachusetts, Inc., and U.S. East Telecommunications of Massachusetts, Inc., and U.S. East Telecommunications of Rhode Island, Inc.

In return for the HCHC stock, USN disbursed, via wire transfers, approximately $68 million out of the IPO proceeds to pay the Purchase Price for CT Tel (including the retirement of CT Tel debt). The Hatten Sellers received a total of $51,767,068.[8] Hatten received $28,295,443.93. Triumph received $17,143,751.35. FSC received $1,908,579.22. Solomon Schechter Day School received $285,369.31. McWay received $2,166,075, pursuant to the Bonuses and Stock Option Plan he had entered with Hatten. Similarly, Mazzarella received $1,967,849 pursuant to the Bonuses and Stock Option Plan he had entered with Hatten. Holders of CT Tel debt, which included Bank Boston, N.A. and Charles Hatten, received a total of $14,492,088.

### D. Expert Testimony on Reasonableness of CT Tel Valuation

As the parties primarily dispute whether USN received "reasonably equivalent value" in return for the $68 million it paid for CT Tel, the court will set next forth the valuation approaches of the parties' valuation experts.

The parties experts differ on the appropriate valuation methods and application of those methods. While the Hatten Sellers contend that the price is reasonable because USN and CT Tel fixed the purchase price of CT Tel based on the value of CT Tel in the marketplace for cellular resellers (as confirmed by comparable transactions), the Liquidating Trustee, through the presentation of its experts' testimony, asserts that the court should instead rely on various valuation studies for the purpose of finding that USN substantially overpaid for CT Tel. The court will review the testimony of the Liquidating Trustee's expert-in-chief, Colin Blaydon, the Hatten Sellers expert, Keith Mallinson, and the Liquidating Trustee's two rebuttal experts, Sharon Armbrust and Robert Ott.

### 1. Professor Colin Blaydon's Testimony

The Liquidating Trustee called Professor Colin Blaydon in his case-in-chief as an expert witness on the subject of whether USN received "reasonably equivalent value" when it paid approximately $68 million to acquire CT Tel.

---

**8.** In September 2001, upon the conclusion of an arbitration involving the Liquidating Trustee and certain of the Hatten Sellers, the Hatten Sellers received a remaining payment due to them, consisting of escrowed monies in the amount of $1,422,000.

Blaydon is a professor of management and Dean Emeritus at the Amos Tuck School of Business Administration at Dartmouth College and the Director of the John H. Foster Center for Private Equity. Blaydon is a professor, researcher, and private consultant in finance and managerial economics. He received his Masters and Ph.D. degrees in applied mathematics from Harvard University and his bachelors degree in electrical engineering from the University of Virginia. Blaydon has been a member of Boards of Directors of a number of companies and firms that have undertaken merger and acquisition activity, and has actively participated in the decisions regarding those mergers and acquisitions. He is also on the Board of Merrill Lynch Private Equity Partners, a collection of investment funds that makes private equity investments in venture capital and buyout situations, both in funds and as direct investments.

Blaydon primarily relied upon a DCF analysis of CT Tel, explaining that he found the DCF method for valuing CT Tel to be "the most reliable and reasonable one to use in this case." Based on his 3–year DCF study using a 15.9 percent discount rate, Blaydon concluded that CT Tel was worth $43.136 million at the time of the acquisition. Blaydon also testified about comparable transactions and other valuation methodologies to corroborate the reasonableness of his DCF valuation. These corroborating methodologies included price to sales method (i.e., valuation based on industry price in relation to annual sales revenue) which drew on five transactions,[9] a price to subscriber method (i.e., valuation based on the median price paid per subscriber) using nine transactions,[10] replacement cost method (i.e., valuation based on CT Tel's cost of adding a new subscriber plus CT Tel's book value), a method by which he made adjustments to a D & T study valuing CT Tel's customer base for financial reporting purposes, and an analysis than demonstrated a decline in market value of the price per subscriber paid in the period from 1995 to 1997.

After reviewing these other valuation methods, Blaydon opined that the fair value of CT Tel was $43.4 million, basing his opinion "primarily on the DCF approach modified by looking at the—in the context of what some of these other indicators are, but not being willing to place a great deal of reliance on [them.] . . . ."

### 2. *Keith Mallinson's Testimony*

The Hatten Sellers called Keith Mallinson to testify as to valuation issues. Mallinson works at the Yankee Group, a market analysis company that provides consulting services in the telecommunications sector for large players in the industry. The Yankee Group also publishes research reports on the industry. Mallinson joined the Yankee Group as a research analyst in 1991 and has been a member of its management committee since 1995. The focus of Mallinson's work at Yankee Group is the wireless industry. He holds an electronic engineering degree from the London University Imperial College and an MBA from the London Business School. Prior to working at the Yankee Group, Mallinson did

---

**9.** Two of the five transactions, however, did not involve cellular resellers and two others were likely the same company.

**10.** Six of his chosen nine transactions, however, were asset base buys and not full company buys. The remaining transactions, included Comtech, Nationwide, and Celltech, which were negotiated at prices within a reasonable range of the price per cellular subscriber that USN paid for CT Tel.

investment related work for a number of employers in Europe.

In describing the competitive landscape for the telecommunications industry during the late 1997—early 1998 time frame, Mallinson noted that due to the opening up of new markets by the 1996 Telecommunications Act, "it was a period of immense enthusiasm, market growth, and also a period of great change." He stated that as of the relevant time period, it was the opinion of himself and of Yankee Group that, there were tremendous opportunities for growth in the cellular reseller area. Mallinson also noted that at the time, the ability to offer a combined bill for a number of services (i.e., one-stop shopping or bundling) was viewed enthusiastically as "the wave of the future."

Turning to CT Tel in particular, Mallinson confirmed that due to its high gross margins, low churn rates, quality resale arrangement with its providers, unified billing platform, and demonstrated ability to meet its projections, CT Tel was a very high quality cellular reseller. He also testified as to a number of synergistic values that CT Tel would have to an acquirer like USN.

From a valuation perspective, Mallinson next explained why he rejected certain valuation methodologies. He noted that many ratio type valuation techniques, such as using multiples of price to earnings ratios, would not apply to companies such as CT Tel because most players in the industry were not publicly traded, did not have earnings information, and had negative earnings. Mallinson also rejected asset-based valuation, noting that while "asset based valuation may be fine if it's a liquidation or an asset strip," it would not be an appropriate way to value an ongoing concern such as CT Tel "that was poised and ready to go exploit what was believed to be a massive expansion in the particular sector at this time."

Mallinson also opined he had some concerns about the Liquidating Trustee's experts' use of DCF studies to determine an appropriate valuation for CT Tel. He noted that while DCF is a widely used technique that can be a good tool when its used objectively and with impartiality, he had two concerns over its use by the Liquidating Trustee. First, he stated that a DCF analysis is not necessarily determinative of what a fair price would be for a firm, because fair market value is often dictated by marketplace factors apart from pure stand-alone valuation. He noted that CT Tel—a proven solid player at the top end of the resale market and with bundling and expansion—was becoming an increasingly scarce entity that could command a high price on the market. Second, he noted that, DCF analyses can yield wildly different valuations depending on the modelers perspective and assumptions. He disagreed that Blaydon's application of the DCF analysis in an adversarial setting fairly valued CT Tel. To illustrate this point he compared Blaydon's and Landry's DCF valuations of CT Tel, and testified as to a number of reasons why he believed Blaydon's DCF models to unfairly understate the valuation of CT Tel. He opined that the most objective and reliable DCF studies were those done by Landry, who was USN's financial modeler at the time of the acquisition.

Instead of offering his own DCF analysis and "get[ting] into this same game of just being another number of the scoreboard," Mallinson opined that a more objective approach would be to value CT Tel on the basis of the per-subscriber-price paid in comparable transactions. He noted that price per subscriber has long been the yardstick used by the cellular resale market. As comparable transactions,

Mallinson chose full company sales of re-sellers close in time to the CT Tel acquisi-tion for which market data was readily available. Based on this criteria, he se-lected the Nationwide, Choice, and Com-tech.[11] He reviewed each of these trans-actions, reviewing the price-per-subscriber paid and discussing key variables that would make these companies stronger or weaker than CT Tel. Based on Mallinson's research, the price-per-subscriber for Na-tionwide was $719; for Choice it was $878; for Comtech is was $900. He noted that CT Tel had capabilities that were greater than any of these companies, which merit-ed an adjustment in per subscriber price to the higher end of the range.

In all, based on his comparables analy-sis, Mallinson opined that the $68 million price paid by USN for CT Tel was fair.

### 3. *Sharon Armbrust's Rebuttal Testi-mony*

The Liquidating Trustee's first rebuttal witness was Sharon Armbrust, of Kagan World Media, a consulting firm in the ar-eas of media and telecommunications. Ka-gan is a 32 year-old investment research firm based in Carmel, California. It fol-lows media and telecommunications sec-tors, including wireless and competitive telecommunications, cable broadcasting, motion picture, and internet. Kagan pro-duces investment research newsletters covering all the sectors if follows and con-ducts conferences for the investment com-munity. In the wireless area, Kagan pub-lishes *Wireless Telecom Investor, Wireless Market Stats,* and *Interactive Mobile In-vestor,* which are monthly newsletters sub-scribed to by upper level executives in the industry and bankers, money managers, lawyers, and brokers associated with the wireless industry. Kagan also published a number of data books that follow the pub-lic companies in the area and does fore-casting for the industry.

Armbrust has been employed by Kagan for 23 years and has followed the cable and telecommunications wireless area for the past 15 years. Prior to becoming a Chief Operating Officer and Senior Analyst of Kagan about two years ago, Armbrust was a Senior Vice President, Investment Re-search and Senior Analysis from 1984 through 2000. Armbrust has written newsletters and collected and supervised the collection of date. She has also orga-nized industry conferences for executives, financiers, and vendors with the wireless industry and spoken on wireless issues at conferences organized by others.

Armbrust presented a valuation based on her own 10–year DCF study using a discount rate of 16.71 percent. In doing so, her starting point was operating data in Professor Blaydon's 3–year DCF study, but she adjusted upwards CT Tel's gross acquisition cost to match the industry av-erage and assumed that CT Tel's future growth would no more than match average industry growth.

Armbrust summarized the status of the cellular telephone industry during the peri-od prior to and at the time of the CT Tel acquisition by USN. She concluded that by 1995, the cellular industry was an eleven-year old industry, that had grown "at a pretty good clip," but was experiencing consolidation and new threat of competi-tion. According to Armbrust, 1995 and 1996 were optimistic times for cellular re-sellers, because there were more licenses being distributed and it was believed that

---

**11.** Mallinson opined that a number of the companies chosen by Blaydon for his price sales valuation, such as Cellular Global and Cellular Hotline, were not comparable com-panies in that they were not cellular resellers.

there would be more competitors off whom the resellers could resell.

Armbrust testified that this optimistic outlook among resellers in 1995–1996 did not materialize for a number of reasons. First, the PCS license auction in January 1996 was not as successful as resellers expected it would be. Many of the entrepreneurs who bid on and won the PCS licenses in that auction could not obtain financing and were unable to consummate their auction bids. Second, Sprint, which had won many licenses and was one of the new PCS competitors, was migrating towards an affiliate program instead of using resellers. An affiliate program gave long-term use to entrepreneurial companies who then took on the burden of building a facilities-based network. Sprint signed up a dozen new affiliates over the course of 1997. For these reasons, growth in the wireless industry declined between 1996 and 1998, with subscriber growth for cellular resellers growing at a slower rate than the rest of the industry.

Armbrust stated that CT Tel was a "mature property that needed to expand out of market and into new areas" if it wanted to continue to grow. She further noted that in 1997, CT Tel had a "rather dramatic" decline in its subscriber growth rate from the prior year. Although CT Tel had a good gross margin, Armbrust stated that it could not counter increased competition and accompanying increased costs. Armbrust questioned CT Tel's ability to succeed with its proposed strategy to grow by moving out of the Connecticut market, stating that CT Tel was "going out of a very tight territory where it had brand equity into new areas where it had to start fresh with a different brand" and "more competition [which] would make it harder to have the same results...." She also testified that CT Tel's plan to expand its services to include local and long distance would negatively impact CT Tel's margins because the gross margins on local and long distance are not as good as the margins on cellular.

Her views of the growth prospects for CT Tel and the industry as a whole informed Armbrust's choice of an appropriate discount rate and growth rate. Based on those inputs to her own DCF analysis, Armbrust concluded that CT Tel should have been valued at $39 to $40 million. To corroborate this figure, Armbrust then compared the CT Tel acquisition to four other transactions she deemed most comparable—the 1997 Comtech transaction and three subscriber base transactions that occurred in 1997—using an adjusted price per subscriber index, a revenue multiple, and a cash flow multiple. She averaged those value indications, which indicated a possible valuation of $47.7 million.

### 4. *Robert Ott's Rebuttal Testimony*

The second rebuttal witness called by the Liquidating Trustee was Robert Ott. Ott is a principal at Kane Reese Associates, Inc., a valuation management and technical consulting firm specializing in the communications, media, and entertainment markets. He has been employed by Kane Reese since 1988. Ott performs consulting and management services and primarily values businesses in the communications, media, and entertainment area. Ott has valued wireless and cellular telecommunications businesses, paging businesses, CLECs, long distance resellers, and local telephone companies. He has testified as an expert witness as to his valuations of telecommunications companies. Ott is listed as a valuation expert in the telecommunications field in the Second Group IV Report introduced into evidence by the Hatten Sellers. Group IV held seminars around the country pertaining to the telecommunications field and wrote various re-

ports regarding mergers and acquisitions in the industry.

Ott critiqued the opinions of Mallinson, and implicitly the views of Hatten and USN, regarding the value of CT Tel in February 1998. Ott's chief criticism is that they relied on limited information, and used only one approach to value CT Tel; they relied solely on the market approach to valuation, focusing only on one method under that approach: comparable sales. Furthermore, in applying the comparable sales method, Mallinson (and the parties to the transaction) used only one index, the price per subscriber.

Ott testified that the Hatten Sellers failed to consider other available multiples that are commonly used in performing a comparable transaction analysis, including the EBITDA multiple method. He stated that published EBITDA indexes in the cellular industry during the time of the CT Tel acquisition ranged from high single digits to low teens. Applying the highest such multiple of 18 to CT Tel's projected EBITDA of $2.6 million yields a valuation of approximately $40 million. Ott noted that in order to accept the conclusion that the value of CT Tel was $68 million, the court would have to assume an EBITDA multiple of 26. Ott indicated that he had never heard of such a high multiple being used in the industry. Ott also performed a valuation based on a multiple of CT Tel's revenues. Using a revenue multiple of 1.0 (approximately the same multiple derived from the Nationwide transactions), yields a value of approximately $43 million.

Based on his own DCF analysis, Ott derived a value range for CT Tel of $31.8 million to $39.8 million. Ott's ultimate value conclusion for CT Tel based on all of his analyses is $38 million.

Like Armbrust, Ott also disagreed with Mallinson that the outlook for resale in early 1998 was "extremely optimistic." He testified that most of the published data indicated that while cellular resale was still continuing to grow, it was growing at a slowing rate, and at a rate lower than that which the underlying cellular carriers were growing. Moreover, he noted that CT Tel's own experience confirmed this slowing growth rate, as CT Tel's net customer additions decreased in every month in 1997, when compared to 1996.

E. *Events Leading to USN's Bankruptcy*

On February 20, 1998, immediately after USN paid for CT Tel, USN had net cash in the amount of $129.4 million and marketable securities in the amount of $9.4 million, totaling $139 in liquid assets. Nonetheless, less than a year later, USN filed its petition for relief under Chapter 11 of the Bankruptcy Code. The court will briefly review, a few of the reasons underlying USN's downfall.

USN's demise was caused by both internal and external factors. First, as of the time period prior to the CT acquisition, D & T audits of USN's financials indicate that USN's "provisioning and billing systems do not adequately capture, provision, and monitor all customer charges." As USN grew much larger in 1997 and 1998, it consolidated billing into one outside vendor (Spectrum) and experienced worse billing delays and errors, which magnified its already existing receivable and collections issues. These continued billing problems negatively impacted revenues and increased USN's customer churn rates. Moreover, as USN continued to grow exceedingly quickly it became clear that it would be unable to meet its projections. USN's growth was highly capital intensive, as USN's expansion relied on its high-cost sales force.

Second, to continue to meet its high-cost growth plans, USN required additional capital before the end of 1998 to continue operations. Elliot testified that as of February 20, 1998, USN "would need some additional working capital financing toward the end of 1998 ... in the amount of approximately $70 million dollars [12] ..., but we did not feel we would have any difficulty getting that [from traditional banking sources]." USN, with the support of its financial advisors, believed that it could raise such capital through a high-yield offering. In April 1998, USN's management began discussing a high yield capital raise with investment bankers, such as Merrill Lynch, including a potential $250 million offering. USN's May 29, 1998 report indicates that the "general consensus of the banking team is that USN should target a raise of at least $200 million in net proceeds from a high yield offering over the next 30 days," and a "second offering will be considered for the fall." Over the summer, however, due in part perhaps to a debt crisis in Russia, the high-yield market took a general downturn, USN was unable to secure the additional financing that it needed.

The parties' experts on insolvency, Walter and Blaydon, testified as to whether USN met any of the insolvency tests of 11 U.S.C. § 548(a)(1)(B)(ii) as of February 20, 1998. While the court will not set forth their testimony in this portion of the opinion, it will instead consider their views in making its conclusions of law.

## II. *DISCUSSION*

The Liquidating Trustee seeks relief under 11 U.S.C. §§ 548(a)(1)(B) and 550(a). Section 548(a)(1) of the Bankruptcy Code recognizes the power of a bankruptcy trustee to challenge transfers or obligations incurred by the debtor as fraudulent. Section 548(a)(1) provides:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on of after the date that such transfer was made or such obligated was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a). Section 548(a) grants the trustee the power to avoid fraudulent transfers accomplished with either actual or constructive fraudulent intent. Section 548(a)(1)(A) provides that a trustee may avoid transfers that were actually fraudulent, while section 548(a)(1)(B) provides that a trustee may avoid transfers that were constructively fraudulent. To the ex-

---

**12.** After USN reevaluated its budget, however, USN's future capital needs rose to $187.4 million.

tent a transfer is voided as fraudulent, section 550(a) then allows the trustee to recover the property transferred or the value of such property from the initial transferee or any immediate of mediate transferee of the initial transferee. *See* 11 U.S.C. § 550(a).

■■■ To recover a transfer as constructively fraudulent under section 548(a)(1)(B) the trustee must prove, by a preponderance of the evidence, the three elements of that section: (1) that the transfer at issue occurred within one year before the date of the filing of the bankruptcy petition; (2) that "reasonably equivalent value" was not provided to the debtor in exchange for the transfer at issue; and (3) that the debtor was insolvent on the date of the transfer or became insolvent because of the transfer. *See In re Resorts Int'l, Inc.,* 181 F.3d 505, 514 (3d Cir.1999) (citing 11 U.S.C. § 548(a)(1)(B)); *Butler v. Lomas & Nettleton Co.,* 862 F.2d 1015, 1017 (3d Cir.1988); *see also In re McDonald,* 265 B.R. 632 (Bankr.M.D.Fla. 2001). To deem such transactions "fraudulent" is somewhat of a misnomer, as no proof of actual fraud is required. Rather, constructively fraudulent transactions are defined simply as transactions in which the debtor receives less than reasonably equivalent value, at a time when the debtor was insolvent under one of three of the provided insolvency tests, and the transaction occurs less than one year before the debtor files its bankruptcy petition.

It is undisputed that the transfer at issue occurred within one year before the date of the filing of the bankruptcy petition, as the transaction at issue took place on February 20, 1998 and USN filed its petition for relief under the Bankruptcy Code on February 18, 1999. The parties' dispute focuses on the second and third prongs required to prove that a transac-

tion may be avoided as constructively fraudulent.

The Liquidating Trustee contends that the USN "received less than a reasonably equivalent value in exchange" for the $68 million value that it paid for CT Tel, as required by § 548(a)(1)(B)(i), and that the financial condition of USN on February 20, 1998, after acquiring CT Tel, fell within one or more of the "insolvency" tests set forth in § 548(a)(1)(B)(ii). Specifically, based on the valuation methodologies explained through their experts' testimony, the Liquidating Trustee requests that the court find that the "reasonably equivalent value" of CT Tel was no more than $43.4 million. To the extent the Liquidating Trustee proves that the reasonably equivalent value of CT Tel was less than $68 million, he may recover the difference between $68 million and this "reasonably equivalent value." *See* 11 U.S.C. § 548(c) (providing transferee who acts in good faith with an offset to the Trustee's recovery "to the extent that such transferee ... gave value to the debtor in exchange for such transfer"); *see, e.g., In re Telesphere Comm., Inc.,* 179 B.R. 544, 559 (Bankr. N.D.Ill.1994) (where debtor derived $38.9 million of value from a $92.7 million transaction, valid section 548(c) defense limited trustee's recovery to $53.8 million).

The Hatten Sellers contend that the Liquidating Trustee has not met his burden of proving that USN received "less than a reasonably equivalent value" in exchange for the $68 million paid for CT Tel. It is their position that USN's acquisition of CT Tel was part and parcel of USN's IPO, and that USN received more than equivalent value from the IPO in totality. It is their further position that the exchange was in any event reasonable in that CT Tel was worth at least $68 million under then prevailing market conditions for sales of cellular resellers like CT Tel,

that CT Tel was worth more than $68 million to USN on an incremental or synergistic basis, and also that it is improper to challenge the transaction under 11 U.S.C. § 548(a)(1) because the transaction was admittedly the product of arms length negotiations between informed and sophisticated parties. The Hatten Sellers also contend that the Liquidating Trustee has not proven that USN was "insolvent," asserting that USN was solvent under each of the tests set forth in § 548(a)(1)(B)(ii).

### A. Did USN Receive "Reasonably Equivalent Value" in the CT Tel Transaction?

To prove its fraudulent transfer claim, the Trustee must first prove by a preponderance of the evidence that USN did not receive "reasonably equivalent value" in return for the approximately $68 million in cash that it paid to acquire CT Tel. In this case, unlike the majority of fraudulent transfer cases brought under 11 U.S.C. § 548, the transaction that the trustee seeks to avoid is one in which USN was *acquiring* property for cash rather than selling property for cash. The "value" transferred by the Hatten Sellers at Closing was all issued and outstanding stock of HCHC, whose sole assets, were, in turn, all the issued and outstanding stock of CT Tel. Thus, at issue here is the whether $68 million was a reasonable value to place on CT Tel.

■ The term "reasonably equivalent value" is not expressly defined or explained by the Code. Rather, Congress left to the courts the task of setting forth the scope and meaning of this term. In so doing, courts have rejected the application of any fixed mathematical formula to determine reasonable equivalence. *See Bundles v. Baker*, 856 F.2d 815, 823–24 (7th Cir.1988) (holding that "reasonable equivalence should depend on the facts of each

case"). Instead, governing case law dictates that in determining whether the Liquidating Trustee has met its burden in proving that USN did receive "reasonably equivalent value," the court should examine the "totality of circumstances" in order to determine whether the CT Transaction "conferred realizable commercial value to [USN that was] reasonably equivalent to the realizable commercial value of the assets transferred [i.e., the $68 million payment]." *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L. Inc. (In re R.M.L. Inc.)*, 92 F.3d 139, 148–49 (3d Cir.1996); *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646–47 (3d Cir.1991); *see also Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 467–68 (4th Cir.1990) (noting that "reasonable equivalence is to be determined by 'an analysis of all the circumstances surrounding the suspect transfer'"); *Jacoway v. Anderson (In re Ozark Restaurant Equip. Co.)*, 850 F.2d 342 (8th Cir.1988) (reasonable equivalent value analysis in fraudulent transfer cases requires consideration of "the entire situation" including market conditions); *In re Northgate Computer Sys., Inc.*, 240 B.R. 328 (Bankr.D.Minn.1999) (noting that inquiry, in deciding whether debtor received reasonably equivalent value is fundamentally one of common sense, measured against market reality). This inquiry is to be performed from the vantage point of creditors rather than that of the debtor. *See Metro Communications, Inc.*, 945 F.2d at 646 (noting that the fraudulent conveyance laws are intended to protect the debtor's creditors and thus "the question whether the debtor received reasonable value must be determined from the standpoint of the creditors.").

■ In employing the totality of the circumstances test, courts consider a host

of factors, including the good faith of the parties, the difference between the amount paid and the fair market value, and whether the transaction was at arms length. *See In re R.M.L., Inc.,* 92 F.3d at 148; *In re Morris Communications,* 914 F.2d at 467 (noting that whether the sale was "an arms length transaction between a willing buyer and a willing seller" is another factor of "considerable importance"); *see also* John C. Murray, Creditors' Rights In Loan Transactions, 474 PLI/Real 437, 452 (2001) (hereinafter, "Creditors' Rights"). For purposes of considering reasonable equivalence, the critical date is the date of the transfer at issue, which in this case is February 20, 1998. *See* Collier on Bankruptcy, § 548.09 at p. 116 (15th ed.1984) (noting that the critical time is when the transfer is "made" and that neither subsequent depreciation or appreciation in value of the consideration should affect the question of whether reasonably equivalent value was given).

To succeed in proving that USN did not receive reasonably equivalent value for its purchase of CT Tel, the Liquidating Trustee must demonstrate that the conclusions drawn by USN as to CT Tel's value at the time of the transaction when USN decided to consummate the acquisition of CT Tel were unreasonable. In attempting to meet his burden of proving that $68 million was a not reasonable value for CT Tel on February 20, 1998, the Liquidating Trustee pits the expert opinions of Blaydon, Armbrust, and Ott regarding the proper valuation of CT Tel against the opinions of Mallinson and implicitly the opinions of Hatten and USN's senior management, board of directors, and financial advisors regarding the reasonableness of CT Tel's

acquisition price in light of the marketplace's valuation of CT Tel on a per-subscriber line basis.

Mindful that the burden of proving lack of reasonably equivalent value falls on the Liquidating Trustee, the Hatten Sellers did not introduce their own DCF analysis in justification of the purchase price paid by USN in their defense case. Rather, they contend that the evidence shows that the price paid for CT Tel was consistent with the marketplace value of CT Tel at the time of the acquisition, and that therefore the $68 million acquisition price was reasonable. While agreeing that a DCF study, when "used with objectivity, impartiality, [and] consistency ... can be a very good diagnostic tool," they argue that the Liquidating Trustee's post-hoc DCF studies do not necessarily reflect fair market value and, in addition, that the use of a DCF analysis in valuing an ongoing business enterprise is "very, very contestable" because "[t]here's so many things that have to go into it that are a matter of opinion."

Before undertaking its analysis, the court pauses make two observations that will frame its analysis of the dispositive issue of "reasonable value."

First, it is clear that experts and industry analysts often disagree on the appropriate valuation of corporate properties, even when employing the same analytical tools such as a DCF analysis or a comparable sales method.[13] Simply put, when it comes to valuation issues, reasonable minds can and often do disagree. This is because the output of financial valuation models are driven by their inputs, many of

---

**13.** Courts and commentators have commented approvingly regarding both methods of valuation. *See Questrom v. Federated Dep't Stores, Inc.,* 84 F.Supp.2d 483, 488 (S.D.N.Y. 2000) (DCF is a "preeminent" valuation technique); *In re Morris Communications,* 914 F.2d at 469 (noting that courts have declared that comparable sales in the relevant time frame to be an appropriate measure of value).

which are subjective in nature. *See* Shannon P. Pratt, et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies,* at 84 (hereinafter, "Valuing a Business") (noting that methods of valuation, including a discounted cash flow analysis are only as good as the inputs to the model). The DCF method involves projections of future cash flows (which are largely dependent on judgments and assumptions about a company's growth rate) and judgments about liquidity and the cost of capital. Similarly, the comparable sales method involves making subjective judgments as to what transactions are "comparable" to the property being valued.

Second, in determining whether a value is objectively "reasonable" the court gives significant deference to marketplace values. When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight. *See In re Morris Communications,* 914 F.2d at 473 (noting "the evidentiary value in the issue of reasonable equivalence in the price [the parties] arrived at after full and fair arm's length negotiations of a reasonable price for [the stock at issue]" and finding bankruptcy judges dismissal of this evidence and determination that the transaction at issue was constructively fraudulent to be clearly erroneous); Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law,* 8 Bankr.Dev. J. 55, 82–86 (1991) (advocating "functional approach" to reasonably equivalent value, which "recognizes that the purpose of fraudulent transfer law is not to allow the debtor to retrade a transaction struck in good faith and arrived at by arm's length negotiations. Such a transfer should not be a

viable target of fraudulent transfer law."). The court will view the evidence presented by the parties on "reasonably equivalent value" through this lens.

In this case, USN decided that the acquisition of CT Tel—and its cellular capabilities and coverage of the Connecticut region—would be an important and value-additive strategic move. USN engaged in appropriate internal and external processes in its purchase decision, including conducting due diligence, consulting with investment bankers, venture capitalists, and D & T, an accounting and consulting firm with expertise in cellular companies. The evidence shows that USN had reasonable knowledge of the relevant facts through due diligence, its knowledge of the market, and its market research, including research into comparable transactions.

The evidence regarding comparable sales close in time to USN's acquisition of CT Tel demonstrates that the price paid for CT Tel was in line with then prevailing values that the marketplace placed on such companies. Both CT Tel and USN valued CT Tel based on the prices per-subscriber being paid in acquisitions of full-company cellular resellers, such as the Choice and Comtech transactions. Contemporaneous industry reports and even the Liquidating Trustee's experts, Blaydon and Ott, confirm that a frequently used indicator of valuation in the telecommunications industry is and was line count.

It is undisputed that CT Tel had 65,243 cellular subscribers. It is also undisputed that CT Tel had 15,836 paging customers, and 4,788 other (local, long-distance, and internet) customers, which Blaydon valued at a total of $7,219,300 ($4,855,800 for paging and $2,363,500 for others). Thus, the price paid by USN per CT Tel cellular line, derived from Blaydon's valuation of its other businesses was approximately

$932 per cellular subscriber ($68 million—$7.2 million/65,243 subscribers). In the company acquisition closest in time to USN's acquisition of CT Tel,[14] WorldCom's acquisition of Comtech, the closing price was about $900 per line. This value remains very close to the CT Tel price of $932 per cellular subscriber. The evidence also shows that CT Tel was a substantially more valuable company than Comtech, having higher gross profit margins and, most importantly, a platform supporting a bundled product offering. The next closest-in-time full company acquisition was WorldCom's 1996 acquisition of Choice. It too provides strong support for the price paid by USN. The 1996 and 1998 Group IV Reports, based on studies of the telecommunications industry, both include prices per subscriber line in the range of $1000 per subscriber for cellular resellers.

The Liquidating Trustee's expert Ott took the position that there was not sufficient information about the comparable transactions that would allow for their use in a comparability analysis. It is clear from the documentary evidence before the court that USN and CT Tel gathered, assembled, and considered the essential comparative information and acted on what they understood was the marketplace's valuation of CT Tel. Moreover, in light of the fact that as Armbrust indicated—it was "obvious[ ]" that CT Tel "was doing well among resellers in the reseller environment," the court sees no reason why a buyer such as USN in late 1997 or early 1998 would need additional data when it was known that each of the acquired companies in the prior major comparable transactions (Comtech, Choice, Nationwide) had important metrics that

were substantially less favorable than those of CT Tel.

In addition, at the time of the transaction, USN ran confirmatory DCF studies of the value of CT Tel on a stand-alone, incremental, and combined basis. These studies were performed by USN's Landry in good faith and in the ordinary course of business during the due diligence period after the parties had agreed upon a price but before they consummated the transaction. Landry's studies used CT Tel's then current business model, including its plans for store expansion, and were extensively reviewed at the time. The valuations generated by Landry's models strongly supported the purchase of CT Tel at the $68 million purchase price.

In attempting to carry his burden of proving that the valuation of CT Tel was not reasonable, the Liquidating Trustee offered the opinions and DCF studies of Blaydon, Armbrust, and Ott. While DCF analysis is a commonly accepted valuation technique, *see, e.g.,* G. Gilbert, "Discounted Cash–Flow Approach to Valuation," Valuation of Closely Held Companies and Inactively Traded Securities (Inst. of Chartered Financial Analysis 1990), any such study is open to differences of view. *See Valuing a Business,* at 154 ("Such economic income projections may be difficult to make—and even more difficult to get two or more parties with different investment perspectives and transaction expectations to agree on"); *see also Neal v. Alabama By–Products Corp.,* C.A. No. 8282, 1990 WL 109243, *9 (Del.Ch. August 1, 1990) ("noting that contrasting opinions regarding [company's] value in August 1995 demonstrate how differently petitioners and respondents view the business prospects and asset valuations of [said compa-

---

**14.** The Comtech transaction was closing at about the same time that USN was in negotia-

tion with the Hatten Sellers over price.

ny]"). These differences in view are based on different assumptions about prospects for growth and the ability to sustain growth in light of increased market competition. The Liquidating Trustee's analyses brought to bear different assumptions about the growth prospects of CT Tel than those used by Hatten, Elliot, and the parties involved in the CT Tel transaction. While the Liquidating Trustees' experts' views about the growth prospects for CT Tel may in hindsight be accurate, their views alone do not convince the court that at the time of the transaction, USN's contemporaneous DCF studies that supported the $68 million price were unreasonable. The informed and sophisticated parties in this case, which included USN, Merrill Lynch, Cowen, DLJ, and Fidelity Capital, did not believe that $68 million was unreasonable and their beliefs were confirmed by both market comparables and DCF studies.

There are several reasons why the DCF valuations performed by the Liquidating Trustee's experts yielded lower valuations than $68 million. Instead of exhaustively reviewing each of the three experts' valuation studies, the court concentrates on Blaydon's analysis for illustrative purposes. First, Blaydon's DCF study was based upon three-year projections that CT Tel had prepared in April 1997 in connection with its recapitalization at that time. These projections, however, were outdated by late Fall 1997 and early 1998, and do not accurately value CT Tel on a DCF basis as of February 20, 1998. By that time, CT Tel was well ahead of the new store pace assumed in the April 1997 projections and was planning the addition of many more new stores, mostly out-of-market, to fuel its growth. Also, the April

1997 projections contained no forecast for local or internet services, as the systems for such services were not yet proven or in-place. Last, in April 1997, CT Tel could not and did not undertake to estimate the growth that could be expected from the fully bundled product that CT Tel began to promote in January 1998. Second, Blaydon chose the prior five year average of 8.5 percent for the telecommunications industry for his growth rate. This rate, however, has no necessary relationship to the then-forecasted growth for the cellular resale industry in general or the near term anticipated growth rate of CT Tel in particular. The effect of Blaydon's choice of growth rate was to reduce the valuation of CT Tel, since high near term growth contributes significantly to value. Third, Blaydon's choice of a 15.9 percent discount rate was higher than the discount rate of 15 percent that was used by both USN and the underwriters at the time of the transaction. Blaydon then added a subjective firm risk factor of 1.5 percent, yet cited no evidence that an objective assessor of value would feel compelled to so enhance the discount rate for an established company like CT Tel with sound business fundamentals and a ten year operating history. The effect of increasing the discount rate is to reduce the present valuation of CT Tel. Last, Blaydon also excluded any incremental or synergistic value in his model, even though CT Tel had such value to any acquirer in the marketplace and USN affirmatively considered such values in the CT Tel acquisition. Such values include, for example, the value of gaining immediate CLEC status in Connecticut and the value of CT Tel's bundled service offering when applied to USN's own operations.[15]

15. Blaydon did not include any synergistic value, because he stated that the documents he reviewed did not establish that USN had given practical considerations to these values.

The evidence demonstrates that this is not the case. The USN Board gave attention to integration issues at its meeting on February 24, 1998, four days after closing. Mazzarella tes-

The analyses of Armbrust and Ott also fail to convince the court that $68 million was not a reasonable valuation for CT Tel in February 1998. Neither Armbrust nor Ott presented a credible basis for rejecting CT Tel's growth assumptions in their work.[16] The evidence shows that CT Tel, a company with a ten year operating history, had low gross acquisition cost per subscriber and was poised, by the end of 1997, for significant growth, especially out-of-market, with the systems, people, and planning in place to achieve such growth. While competition was increasing and the market was consolidating, CT Tel reasonably perceived that it had the market differentiators, such as its bundled product offering, to compete in the marketplace, expand its coverage, and increase its penetration and market share. The court therefore has no basis for finding that it was not reasonable to assume in a DCF analysis that CT Tel would grow in accordance with its management's anticipation in late 1997. Moreover, when the valuations arrived at by Armbrust and Ott are computed on a per-subscriber basis, they value CT Tel somewhere in the range of $350 to $450 per cellular subscriber. The great weight of comparable full company buys indicates that such a per-subscriber line valuation[17] is not corroborated by market indicators of value, which price at significantly higher per-subscriber values.

When the parties negotiated the price of the CT Tel acquisition, they negotiated at arms length and in good faith. When USN agreed to pay $68 million for CT Tel, its management believed that, as of February 1998, it was a fair price. It is clear to the court that the participants' valuations of CT Tel were driven by their assessment of prior comparable transactions, the undisputed fact that CT Tel was a well-run company with an integrated product offering, exceptionally strong business fundamentals as compared with industry averages (e.g., high gross margin, excellent carrier contracts, higher than average bill, low churn rate, and low customer acquisition cost), and, in USN's case, synergies that it could also expect to realize from the transaction. The reasonableness of this valuation was corroborated by USN's DCF studies at the time, which indicated that the perceived value of CT Tel to USN exceeded the price that USN was paying to acquire it.

The high growth wireless market of 1995 to 1998 was marked with wide variances in the assumptions that impact valuation of companies in the space. *See, e.g., Research Report, Credit Suisse/First Boston,* Sept. 7, 1997, at pg. 6. The court agrees with the Hatten Sellers that in this case, especially given the many variables involved, that DCF studies that are done

---

tified that senior executives of CT Tel were taking actions "fast and furiously to allow the prompt introduction of wireless into the USN customer base," which included the renegotiation of its contract with BAM. CT Tel hired new employees in furtherance of the integration, and the senior executives at CT Tel were paid integration bonuses for their work. These actions taken immediately after Closing corroborate that the intent of senior USN management prior to closing was to integrate CT Tel with USN in a businesslike time frame. Accordingly, it is appropriate to include synergistic value in the valuation of CT Tel.

**16.** In addition, the court does not credit Ott's assertion that a reasonable valuation methodology should include, for example, a valuation based on EBITDA. In this case, where most cellular resellers are in a high growth negative EBITDA stage, such valuation methods are not very useful. In fact, Blaydon admitted that CT Tel was the only EBITDA positive cellular reseller during the relevant time period.

**17.** The court notes that Ott himself conceded that in the 1996–1997 time frame the accepted "currency" of resellers was the price paid per line.

after-the-fact and for the purpose of proving a point in an adversarial proceeding are too subjective and too subject to manipulation, and are not particularly probative of the way that industry participants, including the parties in this case, approached the valuation process in the period at issue.

In this instance, the court finds most probative the values that the market placed on comparable acquisitions, such as Comtech, Choice, and Nationwide, all of which had been valued at about $900 to $1000 per line at the time of the initial agreement to be acquired.[18] It is undisputed that CT Tel had business attributes adding significant value above and beyond these comparable transactions, including well regarded management talent, a long operating history, a bundled offering of five telecommunications services, an integrated billing platform, and valuable carrier contracts that permitted out-of-market expansion at current margins. That from the outset of their negotiations, the parties did not start far apart on price, indicates both sides understood that a strong cellular reseller like CT Tel could command a price of approximately $900 to $1000 per line in the marketplace. Indeed, the price paid by USN for CT Tel was well within the marketplace valuation for a strong cellular reseller like CT Tel in early 1998.

For the reasons set forth above, the court concludes that the Liquidating Trustee has failed to meet his burden to prove that USN received less than reasonably equivalent value for the $68 million in paid to acquire CT Tel.

### B. *Was USN Insolvent or Rendered Insolvent by the CT Tel Acquisition?*

To succeed on its fraudulent transfer claim, in addition to proving that USN received less than reasonably equivalent value, the Liquidating Trustee must also prove, by a preponderance of the evidence, that USN was either rendered insolvent by the CT Tel acquisition or insolvent as of the Closing date of February 20, 1998, under one or more of the three insolvency tests set forth in 11 U.S.C. § 548(a)(1)(B)(ii)—the balance sheet test, the unreasonably small capital test, or the ability to pay debts as they come due test.

The parties' dispute on insolvency focuses on the first two tests of 11 U.S.C. § 548(a)(1)(B)(ii). The Liquidating Trustee does not appear to contend that USN could satisfy the third of the three tests mentioned above—ability to pay debts as they come due. In any event, the Liquidating Trustee offered no evidence that, following the acquisition of CT Tel, USN was unable to pay its debts as they came due. Rather, the evidence showed that USN had very large working capital to pay debts as they would come due and that USN was indeed paying its debts as they came due. Thus the court will focus its insolvency analysis on the balance sheet test and the unreasonably small capital test.

### 1. *Was USN Insolvent or Rendered Insolvent under the "Balance Sheet Test"?*

A determination of whether USN was insolvent for purposes of 11 U.S.C.

---

**18.** While the price per line at closing for each of these was less due to subscriber growth between the time of initial agreement and closing, this was not the case for CT Tel because "the CT Tel acquisition occurred quickly." There was just a six week period between the date the Stock Purchase Agreement was signed and the Closing. It should also be noted that industry reports, such the Group IV Report indicated that a cellular reseller with a gross cellular margin of 45 percent was worth approximately $1000 per line.

§ 548(a)(1)(B)(ii)(I) of the Code requires an analysis of USN's liabilities as compared to the fair value of USN's assets at or around the Closing. *See* 11 U.S.C. § 101(32)(A) (defining "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property at a fair valuation"). The Third Circuit has stated that "[w]here bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis." *Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1067 (3d Cir. 1992).

Courts use a "balance sheet test for insolvency, comparing assets to debts." *Official Committee of Former Partners v. Brennan (In re Labrum & Doak, LLP),* 227 B.R. 383, 387 (Bankr.E.D.Pa.1998). While the inquiry is labeled a "balance sheet" test, the court's insolvency analysis is not literally limited to or constrained by the debtor's balance sheet. Instead, it is appropriate to adjust items on the balance sheet that are shown at a higher or lower value than their going concern value and to examine whether assets of a company that are not found on its balance sheet should be included in its fair value. *See In re Trans World Airlines, Inc.,* 180 B.R. 389, 405 n. 22 (Bankr.D.Del.1994) (noting that balance sheet is only the starting point in the analysis because, for example, "[f]inancial statements prepared in accordance with Generally Accepted Accounting Principles (GAAP) do not record assets at fair market value … 'property' may include assets not even listed on the balance sheet [, and d]ebts are recorded only to the extent they are known and quantifiable").

The Liquidating Trustee's chief expert, Blaydon, showed that the actual balance sheet of USN, taking into account the IPO proceeds and the enterprise value of CT Tel (at $69.1 million), was positive in the amount of $83.7 million on January 31, 1998 and $67.8 million on February 28, 1998. The parties, therefore, do not dispute that the actual balance sheet of USN was substantially positive following the acquisition in the absence of any adjustments to the balance sheet. In addition, the Liquidating Trustee introduced no evidence that the acquisition of CT Tel caused USN to become insolvent. Rather the evidence showed that the purchase of CT Tel had nothing to do with the bankruptcy filing of USN nearly one year later, on February 18, 1999. Indeed, CT Tel was not part of the USN bankruptcy filing.

The Liquidating Trustee contends, however, that, based on Blaydon's testimony, several adjustments are required to fairly value USN's assets and liabilities as of the Closing date and that when those adjustments were made, the adjusted balance sheet demonstrates that USN was insolvent on a balance sheet basis. Blaydon opined that several adjustments to USN's balance sheet were required to ascertain the true value of USN as a going concern. Among Blaydon's adjustments to USN's balance sheet were (i) reducing the value of USN's accounts receivable to 50 percent of the gross accounts receivable, due to the serious problems that USN was experiencing in billing;[19] (ii) adjusting the value of CT Tel from $69.1 million to his a value of $43.4 million which correlates to his value conclusion as to CT Tel. Blaydon testified

---

**19.** Much of the evidence and assessments of the poor state of USN's accounts receivable did not surface until after Closing. George Doyle, the executive vice president of USN's billing vendor, Spectrum Telecorp, testified that 30 to 60 percent of USN lines billed had no usage associated with them. USN's databases caused delays and problems and bills were still sent out to customers who had terminated service.

that after his adjustments, the balance sheet of USN on February 20, 2002 was "at a negative $5.8 [million] to a plus $2.2 [million] range."

Based on the court's above finding that the Liquidating Trustee has not proved that the fair enterprise value of CT Tel was not less than $68 million, the court cannot credit Blaydon's $25.7 million adjustment to USN's balance sheet as a fair value for CT Tel. Disregarding this adjustment alone in Blaydon's hypothetical solvency analysis means that the fair value of USN's assets exceeded its liabilities as of February 20, 1998. Moreover, even were it appropriate to value USN's accounts receivable at 50 percent of their gross value due to the USN's billing problems,[20] Blaydon also failed to examine the value of USN's customer base as of February 20, 1998 where the evidence showed that USN's customer base was a very valuable asset whose value should be included in any insolvency analysis.

Because many of the adjustments that Blaydon made were unsupported and because he failed to make certain required upward adjustments to the balance sheet, the court is not convinced that his hypothetical balance sheet provide support for the proposition that USN was insolvent on February 20, 1998. For these reasons, the court finds that the Liquidating Trustee did not carry his burden of proving that USN was insolvent on a balance sheet basis.

2. *Was USN Engaged in a Business, or About to Engage in a Business for Which Any Property Remaining with USN was an Unreasonable Small Capital?*

The Liquidating Trustee alternatively contends that even if the court disregards some of Blaydon's balance sheet adjustments so that the fair value of USN's assets exceeded its liabilities as of February 20, 1998, he has nonetheless met his burden of proving that USN had unreasonably small capital under 11 U.S.C. § 548(a)(1)(B)(ii)(II).

Although the Bankruptcy Code does not define "unreasonably small capital," the Third Circuit recognizes that it "denotes a financial condition short of equitable insolvency." *Moody,* 971 F.2d. at 1070. The Third Circuit further explains that:

"Unreasonably small capital" would refer to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency.

*Id.* In *Moody,* the Third Circuit held that the test for "unreasonably small capital" is "reasonable foreseeability." *Id.* at 1073. That is, was it reasonably foreseeable on the date of Closing of February 20, 1998 that USN would have unreasonably small capital to carry out its business?

Determining whether a firm has unreasonably small capital requires an objective assessment of the companies' financial projections—"critical question is whether the parties' projections are reasonable." *Id.* In addition,

[b]ecause projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are

---

**20.** While a fifty percent adjustment seems excessive, such a determination is difficult, because it is difficult to correlate billed lines with no usage to the incremental effect (over and above making allowances for doubtful accounts) upon USN's accounts receivable.

cash flow, net sales, gross profit margins, and net profits and losses. *See Credit Managers Ass'n*, 629 F.Supp. at 184–86. However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.

*Id.* Moreover, "the test for unreasonably small 'capital' should include … all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." *Id.* at 1072 n. 24 (citing reference omitted).

The Liquidating Trustee argues that the capital of USN was unreasonably low because, according to USN's own projections, USN did not plan to become cash flow positive until 2000 and did not have sufficient capital to cover operating losses until that time. In addition, the Liquidating Trustee asserts that USN had severe operating problems that were out of control, especially in the billing area, that these problems were not resolvable, that they would surface, and that they would negatively impact USN's performance against its projections. Last, the Liquidating Trustee contends that USN could not have reasonably anticipated that it would have access to additional capital in 1998 or thereafter.

The Liquidating Trustee notes that as of Closing, USN had substantial long term liabilities from prior high-yield offerings that would come due in the future. USN had long-term debt of approximately $186 million, and was obligated to begin making payments on long-term debt in 1999, before it projected cash-flow positive business. Blaydon opined that given the large amount of long-term debt coming due in the future, USN could not scale back on its high-cost direct sales operations and still be able to grow its customer base at a rate that would generate enough revenue to pay its liabilities.

The Liquidating Trustee also underscores that USN failed to engage in a bottom-up budgeting process to assess the viability of its projections until after its IPO. The Liquidating Trustee also points out that Elliot knew that USN would need additional capital of $70 to $80 million toward the end of 1998, a number than was later adjusted significantly upwards after USN completed its bottoms-up budget in April 1998, but assumed that USN could raise this capital. Last, the Liquidating Trustee asserts that USN knew that the high-yield market was highly volatile and could close down very easily, and that it was not reasonable of USN to assume at the time of the CT Tel acquisition that it could obtain the capital necessary to sustain its operations.

The parties agree that on February 20, 1998, immediately after USN paid for CT Tel, USN had net cash in the amount of $129.4 million and marketable securities in the amount of $9.4 million, totaling $139 in liquid assets. Thus, at its then current burn rate of $12 million per month, USN had sufficient cash and marketable securities to continue operations for approximately one year. Blaydon stated in his report that USN's cash would last 11 months, and the marketable securities and additional March 1998 IPO proceeds (from over-allotment sales) would add another month.

While it was clear to USN management that it would need additional capital to continue to fund its business, the evidence indicates that all parties involved believed that USN could raise this capital from the capital markets. In the relevant time period, USN believed that it would not have

"any difficulty" in obtaining additional capital in 1998 as it needed more capital, because it was the fastest growing CLEC in the country and had strong financial backers. As Elliot explained in his deposition,

> by February 20, 1998 we had just completed an IPO. We were in a high growth mode. We felt we had lots of additional access to capital if we needed it. We had strong financial supporters and backing from some significant banking investment groups and the business was growing. I did not believe we were insolvent.

Elliot Aug. 16, 2001 Dep. Tr. at 81. USN's February 24, 1998 CFO Report similarly states that "Wall Street ... is supportive of financing new CLEC participants as well as providing additional financing to existing CLECs which can demonstrate progress in executing their strategy."

The evidence shows that in the period immediately following February 20, 1998, Merrill Lynch's telecommunications industry analysts had great expectations of USN and the CLEC industry. Another of USN's investment bankers, Cowen, also believed that USN would have access to additional capital through either "another round of high yield debt financing or a secondary offering of stock," when it initiated coverage of USN on April 15, 1998. In fact, several investment banking houses, including Merrill Lynch and Bear Sterns, were actively engaged in assisting USN in readying its high-yield offering well into the summer of 1998. While the capital markets remained favorable to telephone companies (including CLECs) in early 1998, with telecommunications companies raising large amounts of capital during that year, the evidence shows that the capital markets unexpectedly dried up in the late summer of 1998. In the arbitration proceeding between the Hatten

Sellers and the Liquidating Trustee, Peltz's counsel attributed the beginnings of USN's financial difficulties to its inability to proceed with a high-yield debt offering on account of the Russian debt default in the summer of 1998. Elliot testified that USN's requirements for capital did not arise until it pulled its high-yield offering of $250 million due to adverse market conditions at that time.

The Liquidating Trustee offered no evidence that the USN Board or any senior manager believed that USN had unreasonably small capital on February 20, 1998. The evidence shows to the contrary. No USN document indicates that USN viewed itself as a distressed company in early 1998. Senior managers, including the CFO, Gerald Sweas, the Vice President for Business Assurance and Analysis, Thad Pellino, and Senior Manager for Planning and Analysis, Craig Boskey, purchased USN stock in the IPO. The CEO, Thomas Elliot, and COO, Dennis Dundon purchased USN stock in August 1998.

USN believed that it would be able to access the capital markets as late as July 1998 and thereafter. This belief was shared by senior executives with intimate knowledge of USN's operating challenges and by USN's financial advisors. The issue before the court is whether USN's expectations that it could again access the capital markets were unreasonable. Evidence regarding the statements and actions of USN and its financial advisors and the strong marketplace support for companies like USN indicate that it was not. No percipient witness or document suggests that in the time frame near February 20, 1998, USN should not plan and operate on the assumption that it would not have access to additional capital, if it needed it. There was simply no indication that as of February 20, 1998, USN was unreasonable in thinking that it could continue to spend

its capital to grow and that it would secure additional capital at the end of the year.

USN thus settled on a plan requiring additional capital through a new capital raise, because at that time USN and its investment bankers believed that such a capital raise would be available. In sum, nothing in the record convinces the court that such beliefs were not reasonable or that the changed market conditions that foreclosed USN's access to capital were reasonably foreseeable at the time of Closing.

Although USN had high growth plans that contemplated the need for additional capital before USN could become EBIT-DA positive, the presence of these plans does not mean that as of February 20, 1998, USN, a company with approximately $140 million in liquid capital (plus a substantial capacity to secure additional capital through lending institutions), had unreasonably low capital. It is clear that USN had its operating challenges, including dealing with its billing and collection problems and adjusting its planning and projections as it grew at a rapid rate. But these challenges were associated with meeting its projected growth rate and the market's expectations, not with all out business failure. And, as indicated in the February 24, 1998 CFO Report, USN was undertaking to address those challenges. Moreover, the fact that a company may have operating difficulties at a point in time does not mean that it cannot reasonably expect to have access to traditional banking sources either at the time of difficulty or at a later point in time.

After its 1997 capital raises, USN became "one of the fastest growing CLECs in the United States" in a new marketplace created by the Telecommunications Act of 1996. Making projections in an environment of changing industry and economic conditions is particularly difficult. The Liquidating Trustee's bases much of his position on the unreasonably small capital determination on the fact that USN did not meet its projections, and argues that its projections were unreasonable. He presents no evidence, however, that USN's forecasting was any worse than any other fast growing CLEC in the dynamic marketplace, nor is there any evidence that USN had failed to take into account its high growth rate and the resulting degree of unpredictability when formulating its plans.

In the Spring of 1998, USN adopted an aggressive budget as it continued in a high growth mode. It did so based on the continued assumption that it could raise new capital through a high-yield offering. That would fail, and thus its budgeting projections would also fail. However, had USN perceived that it would not have access to the additional capital required to fuel its growth, it could have adjusted its operations to manage and preserve the considerable working capital that it had, instead of using that money to fund its growth.[21] It could have continued to meet its debt obligations by taking steps such as refinancing its notes, raising money in the future through equity markets, or selling the company.[22] But USN did not scale back its operations until months after the CT Tel closing (in the third quarter of

---

21. Unlike a manufacturing company with high fixed costs, USN was a marketing company, in which people-related costs accounted for nearly 70 percent of its operating expenses. It therefore had significant flexibility to adjust its operations to manage and preserve working capital if it chose to do so.

22. One Merrill Lynch analyst report, from February 1998, stated that USN was in fact viewed as a prime takeover target by telecom analysts.

1998), because it was only at that point that USN realized that it would not have access to additional capital.

As of February 20, 1998, due to its successful IPO, USN had immediate funds totaling $139 million, and in addition, now owned CT Tel, a debt-free EBITDA-positive company. Like many high growth companies, USN was burning through cash at a rapid rate, and required an infusion of additional capital to meet its goal of becoming cash flow positive within the next two years. However, it also had reasonable expectations that it would be able to access the capital markets to procure the additional capital required by its plans for growth. The court cannot conclude that USN had unreasonably small capital when it had substantial liquid assets and reasonably anticipated additional near term capital infusions. *See Moody*, 971 F.2d at 1072 n. 24. Despite the operating challenges highlighted by the Liquidating Trustee, the court is not convinced that USN's financial condition was at that time so precarious as to bring it into the realm of insolvency required to succeed on its fraudulent transfer claim. *See id.* at 1073 (noting that "businesses fail for all sorts of [unforeseeable] reasons and that fraudulent conveyance laws are not a panacea for all such failures"). Accordingly, the court finds that USN did not satisfy the unreasonably small capital test for insolvency.

## III. *CONCLUSION*

The court holds that the Liquidating Trustee has failed to prove his fraudulent conveyance claim by a preponderance of the evidence. Based on the court's foregoing findings of fact and conclusions of law, the Liquidating Trustee has not met his burden in proving that USN's payment of $68 million for CT Tel was not reasonably equivalent value, nor has he succeeded in proving that USN was insolvent as of the closing date of the transaction at issue. Accordingly, the court will direct the Clerk of the Court to enter judgment in favor of the defendant Hatten Sellers and against the plaintiff Liquidating Trustee.